**Pauline SACKS et al., Appellants,**

**v.**

**REYNOLDS SECURITIES, INC., et al.**

**No. 77–1775.**

United States Court of Appeals, District of Columbia Circuit.

Argued May 2, 1978.

Decided Dec. 19, 1978.

S. Churchill Elmore, Washington, D.C., for appellants.

Edward M. Statland, Washington, D.C., with whom Barry A. Zaslav and David W. Buckley, Washington, D.C., were on the brief, for appellees.

Before TAMM and ROBB, Circuit Judges, and RONALD N. DAVIES, Senior United States District Judge for the District of North Dakota.*

Opinion for the court filed by TAMM, Circuit Judge.

TAMM, Circuit Judge:

Appellants, Pauline Sacks, et al.,[1] brought suit in the United States District Court for the District of Columbia to recover compensatory and punitive damages from appellees, Reynolds Securities, Inc. (RSI), et al.,[2] which allegedly resulted from delay in transferring certain of appellants' stock accounts. The district court (Waddy, J.) dismissed the complaint pursuant to Rule 12(b)(1), Federal Rules of Civil Procedure, for lack of subject matter jurisdiction. We find that, although appellants have invoked federal jurisdiction, the factual allegations in their complaint fail to establish a federal cause of action. Accordingly, we affirm the dismissal of the district court.

## I

The facts of this case are, for the most part, uncontroverted. RSI is a securities broker and dealer with offices in the District of Columbia and Virginia. Pauline Sacks, a Virginia resident, is a former RSI account representative and a former customer. In November 1975, Mrs. Sacks left her position at RSI to work as an account representative at Loeb, Rhoades & Co. (Loeb), another securities broker. When she resigned, Mrs. Sacks arranged to have her personal accounts and the accounts of some of the customers she serviced transferred from RSI to Loeb. RSI failed to transfer the accounts within the five-day period provided by New York Stock Exchange (NYSE) Rule 412.[3] Appellants

---

\* Sitting by designation pursuant to 28 U.S.C. § 294(d).

1. Marvin Sacks, husband of Pauline Sacks, and Emanuel Ellick Sacks and Sharon Ann Sacks, children of Pauline and Marvin Sacks, Joint Appendix (J.A.) at 17, are included as appellants. The other appellants are former customers of Reynolds Securities, Inc. (RSI) whose accounts were handled by Pauline Sacks and who requested that their accounts be transferred to Loeb, Rhoades & Co. (Loeb) at the time she changed her position. *See* text *infra* at — – of 193 U.S.App.D.C. at 1237 of 593 F.2d.

2. Ronald D. Masci, manager of RSI's Arlington, Virginia office, J.A. at 106, is also named as an appellee.

3. New York Stock Exchange (NYSE) Rule 412 is entitled *Customer Account Transfer Contracts* and provides as follows:

> Upon notice from a customer of his intention to transfer his account(s) from one member organization to another, both member organizations shall expedite the transfer.
>
> Upon receipt from a customer of a signed instruction to receive his account from another member organization together with a current statement of such account, the receiver broker may submit such statement to the carrying broker, who must in writing and within five business days following receipt, verify (or take exception to) the positions and money balances (adjusted for interest on a debit balance) carried by him for such customer. Thereafter, the receiving broker may, at his option, give the carrying broker five days written notice to complete the transfer. At the termination of such notice, the receiving broker and the carrying broker shall establish fail to receive—fail to deliver contracts at current market values upon their respective books of account against the long

claim to have suffered various injuries and damages as a result of this delay.[4] *See Sacks v. Reynolds Securities, Inc.,* 434 F.Supp. 37, 38–39 (D.D.C.1977).

Appellants attempted to establish federal jurisdiction on two grounds—diversity of citizenship, *see* 28 U.S.C. § 1332 (1976),[5] and the existence of a question arising under the Securities and Exchange Act of 1934 (Act), 15 U.S.C. §§ 78a–78kk (1976); *see* 15 U.S.C. § 78aa (1976).[6] The district court found that because some plaintiffs and defendant Masci were citizens of the same state, diversity jurisdiction was not proper-

security positions in the customer's account and the receiving broker or his New York correspondent shall charge the related money amount (after properly considering the debit or credit balance in the customer's account) to the carrying broker, or his New York correspondent, through Stock Clearing Corporation. Simultaneously, any short security positions in the account shall be delivered by the receiving broker, i. e., the broker who is receiving the account or his New York correspondent, to the former carrying broker, or his New York correspondent and the customer's account shall thereupon be deemed transferred.

The fail contracts resulting from the aforementioned procedure, whether or not involving securities listed on this Exchange, shall be treated as written Exchange contracts, "ex Clearing House", made on the date of establishment of the fails and subject to close out in accordance with Rules 282–284.

Coordination of activities with respect to the account by both receiving and carrying organizations should be to the end that the customer shall not incur any loss in respect to improper execution, or failure to execute open orders, or on account of dividends of cash and securities and other similar distributions (rights, warrants, stock splits, etc.), interest, bond or preferred stock calls for redemption and tenders as a result of his account having been transferred.

*Id.* at 38.

4. Mrs. Sacks further sought recovery of damages for unlawful employment discrimination. *Id.* at 13–16 Mr. Sacks also filed a claim for the loss of his wife's services and the loss of consortium caused by the emotional strain she experienced as a result of appellees' conduct. *Id.* at 18.

5. 28 U.S.C. § 1332 (1976) in pertinent part provides that the federal district courts shall have original jurisdiction of civil actions between citizens of different states.

ly invoked. 434 F.Supp. at 39; *see Strawbridge v. Curtiss,* 7 U.S. 159, 3 Cranch 267, 2 L.Ed. 435 (1806). Appellants have not appealed that ruling.

Appellants advanced two arguments in support of their contention that the factual allegations in the complaint raise a question under the federal securities laws. First, they asserted that appellees' failure to promptly transfer the accounts amounted to a violation of section 10(b) of the Act, 15 U.S.C. § 78j(b) (1976),[7] and of the Securities and Exchange Commission's (Commission) Rule 10b–5, 17 C.F.R. § 240.10b–5 (1977).[8]

6. 15 U.S.C. § 78aa (1976) in pertinent part provides:

The district courts of the United States, and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have exclusive jurisdiction of violations of this chapter or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this chapter or the rules and regulations thereunder.

7. Section 10(b) of the Securities Exchange Act of 1934 (Act), 15 U.S.C. § 78j(b) (1976) provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

. . . . .

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

8. Rule 10b–5, 17 C.F.R. § 240.10b–5 (1977), promulgated pursuant to section 10(b) of the Act, 15 U.S.C. § 78j(b), states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statement made, in the light of the circumstances under which they were made, not misleading, or

Second, they argued that a private federal right of action arose from the alleged violation of NYSE Rule 412. The district court rejected both arguments and granted appellees' motion to dismiss for lack of subject matter jurisdiction. 434 F.Supp. at 38–39.

■ We agree that neither argument sufficiently establishes a federal cause of action. Subject matter jurisdiction exists, however, when a complaint purports to state a claim under federal law, and the right of recovery will be sustained if the law is given one construction, but defeated if given another. *See Wheeldin v. Wheeler*, 373 U.S. 647, 649, 83 S.Ct. 1441, 10 L.Ed.2d 605 (1963); *Bell v. Hood*, 327 U.S. 678, 682–85, 66 S.Ct. 773, 90 L.Ed. 939 (1946). Under these facts, we note that the correct motion for dismissal would have been made pursuant to Rule 12(b)(6), Federal Rules of Civil Procedure, for failure to state a claim upon which relief can be granted.

■ If material other than the pleadings is considered by the court, a Rule 12(b)(6) motion will be treated as a Rule 56 motion for summary judgment, and both parties must be afforded a reasonable opportunity to submit affidavits and extraneous proofs.[9] Fed.R.Civ.Pro. 12(b). The district court considered extra-pleadings material in this case. 434 F.Supp. at 39. Each side, however, had full and fair opportunity to offer both oral and written evidence in support of their position, and conversion of a Rule 12(b)(6) motion to one for summary judgment would be entirely proper.

■ The district court's action under Rule 12(b)(1) does not affect our disposition in this case. "The liberality of the . . . Federal Rules is such that erroneous nomenclature does not prevent the court from

recognizing the true nature of a motion." *Owen v. Kronheim*, 113 U.S.App.D.C. 81, 83, 304 F.2d 957, 959 (1962) (per curiam). Despite the invocation of Rule 12(b)(1), the memoranda submitted by both parties adequately discuss the existence of a federal cause of action. Accordingly, we uphold the district court's dismissal on the ground that appellants have failed to establish a federal claim upon which relief can be granted. *See Dennis v. Hein*, 413 F.Supp. 1137, 1139 (D.S.C.1976); *Davis v. Rio Rancho Estates, Inc.*, 401 F.Supp. 1045, 1047 (S.D.N.Y.1975).

## II

■ The antifraud provisions of section 10(b) of the Act and Rule 10b–5 prohibit the use of manipulative or deceptive practices in connection with the purchase or sale of any security. By their express terms, *see* notes 7 & 8 *supra*, a transfer of security ownership is necessary in order for an action to lie under either the statute or the rule. The district court found, and we agree, that appellants failed to meet this requirement.[10] 434 F.Supp. at 39.

■ In determining what may be considered a purchase or a sale, we look to the meaning of the words within the context of section 10(b). *SEC v. National Securities, Inc.*, 393 U.S. 453, 466, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969). Congress has provided statutory definitions of the terms "purchase" and "sale": a " purchase . . . include[s] any contract to buy, purchase or otherwise acquire" securities, 15 U.S.C. § 78c(a)(13) (1976); and a " sale . . . include[s] any contract to sell or otherwise dispose of" securities, 15 U.S.C. § 78c(a)(14) (1976). Appellants attempt to show that

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

9. *See generally* C. Wright & A. Miller, Federal Practice and Procedure: Civil § 1366 (1969).

10. Because we find that appellants have failed to prove that the alleged fraudulent activity occurred in connection with the purchase or

sale of any security, we need not explore whether the delayed transfer in fact constituted deceptive conduct within the meaning of Rule 10b–5. Although the district court judge found that appellees' conduct was not tantamount to fraud, his conclusion that no violation of Rule 10b–5 had been shown was premised on an evaluation of the purchase and sale requirement. *Sacks v. Reynolds Securities, Inc.*, 434 F.Supp. 37, 39 (D.D.C.1977).

the alleged wrongful conduct of appellees was in connection with the purchase or sale of any security by contending that the transfer of accounts between brokers, pursuant to a contract, comes within the meaning of the statutory phrase "otherwise dispose of," 15 U.S.C. § 78c(a)(14). Brief for Appellants at 12. The district court correctly rejected this argument. 434 F.Supp. at 39.

In *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), the Supreme Court held that only *actual* purchasers or sellers of securities may bring a private action for damages under Rule 10b–5. The Court emphasized that "the wording of § 10(b), making fraud *in connection with the purchase or sale of a security* a violation of the Act, is surely badly strained when construed to provide a cause of action, not to purchasers or sellers of securities, but to the world at large." *Id.* at 733 n.5, 95 S.Ct. at 1924 (emphasis in original).

■ Consonant with this purpose, lower federal court interpretations of purchase and sale, although encompassing many transactions that bear little overt resemblance to conventional cash sales,[11] require some surrendering of control, change in ownership, or change in the fundamental nature of an investment before a transfer will be deemed within the ambit of Rule 10b–5.[12] None of these elements is present in this case. Appellants never parted with

ownership of the securities, nor was such ownership ever vested in any other party. Moreover, appellants made no showing that their control was alienated, or that RSI appropriated their property. Appellants likewise cannot contend that the transfer changed the nature of their investments, stripped the stock of its value, or converted it into a remote right to receive money. Thus, the custodial transfer of stock from one broker to another while legal ownership remains in the same investor cannot be construed as a sale within Rule 10b–5.

Nevertheless, appellants urge us to hold that the transfer comes within the statutory phrase defining sale as a transaction that "otherwise dispose[s] of" securities. *See* 15 U.S.C. § 78c(a)(14). The Supreme Court's admonishment in *Blue Chip Stamps*, along with the plain meaning of the phrase,[13] compels us to reject a definition of "otherwise dispose of" that disregards the traditional elements of a sale under Rule 10b-5.

■ Appellants also attempt to bring themselves within the purchase and sale requirement of Rule 10b-5 by arguing that appellees' failure to timely transfer their accounts "prevented [appellants] from buying or selling securities for long periods of time." Brief for Appellants at 10. Assuming that the delayed transfer did inhibit trade as appellants contend, this action would still remain without the protective umbrella of Rule 10b-5.

---

11. *See, e. g., SEC v. National Sec., Inc.*, 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969) (exchange of securities in merger and consolidation); *Coffee v. Permian Corp.*, 434 F.2d 383 (5th Cir. 1970) (stockholder deemed seller when liquidation of corporate assets converted stock into claims for cash), *cert. denied*, 412 U.S. 920, 93 S.Ct. 2736, 37 L.Ed.2d 146 (1973); *Rekant v. Desser*, 425 F.2d 872, 876–78 (5th Cir. 1970) (issuance by a corporation of its security constitutes a sale); *Schoenbaum v. Firstbrook*, 405 F.2d 215, 219 (2d Cir. 1968) (en banc) (same), *cert. denied, sub nom. Manley v. Schoenbaum*, 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969); *Hooper v. Mountain States Sec. Corp.*, 282 F.2d 195, 202–03 (5th Cir. 1960) (issuance of stock in exchange for spurious assets), *cert. denied*, 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693 (1961).

12. Accordingly, courts in the following cases have found no purchase or sale: *McClure v. First Nat'l Bank*, 497 F.2d 490, 495–96 (5th Cir. 1974) (pledge of stock in consideration of renewal of a loan not a sale), *cert. denied*, 420 U.S. 930, 95 S.Ct. 1132, 43 L.Ed.2d 402 (1975); *International Controls Corp. v. Vesco*, 490 F.2d 1334, 1342–43 (2d Cir.) (transfer of security from subsidiary corporation to second wholly owned corporation not a sale), *cert. denied*, 417 U.S. 932, 94 S.Ct. 2644, 41 L.Ed.2d 236 (1974); *Herpich v. Wallace*, 430 F.2d 792, 812 (5th Cir. 1970) (guarantor of pledgor not a "purchaser" of pledged stock in absence of allegation of foreclosure).

13. *See* Webster's Third New International Dictionary 654 (1971) ("dispose of"—"to transfer into new hands or to the control of someone else (as by selling or bargaining away)").

In *Blue Chip Stamps*, the Court explained that the actual purchaser or seller requirement barred three principal classes of potential plaintiffs from maintaining an action under Rule 10b-5: first, potential purchasers of shares; second, actual shareholders who refrain from selling; and third, shareholders who claim that fraudulent activity decreased the value of their investment. 421 U.S. at 737–38, 95 S.Ct. 1917. Fear of wholly subjective proof and its capacity for distortion and abuse supports the distinction between actual and potential purchasers and sellers. If potential purchasers and sellers could sue under Rule 10b-5, a plaintiff could maintain an action on the strength of uncorroborated oral testimony about his motivation in not pursuing a profitable, but perhaps hypothetical, course of action. The jury would be forced to assess critical factors guided only by the undocumented, subjective testimony of the plaintiff. *Id.* at 735, 746–47, 95 S.Ct. 1917. In this context, opportunities to present misrepresentative oral testimony are particularly prevalent and the concomitant dangers particularly grave. *Id.* at 743, 95 S.Ct. 1917. As Mr. Justice Rehnquist explained:

> While much of the development of the law of deceit has been the elimination of artificial barriers to recovery on just claims, we are not the first court to express concern that the inexorable broadening of the class of plaintiffs who may sue in this area of the law will ultimately result in more harm than good.

*Id.* at 747–48, 95 S.Ct. at 1931.

The decision in *Blue Chip Stamps* disposes of appellants' argument. Testimony as to courses of action appellants would have pursued had the transfer been executed promptly is inherently subjective and defies objective corroboration. Appellants attempt, however, to avoid the effect of *Blue Chip Stamps* by asserting that the failure to

transfer forced them to sell stock not held by RSI, and that this sale satisfies the requirements of Rule 10b-5 with regard to the stock held by RSI. *See* Brief for Appellants at 10. As we previously have explained, *Blue Chip Stamps* does not permit recovery under Rule 10b-5 when alleged fraud causes an investor to retain ownership of securities. *See Halperin v. Edwards & Hanly*, 430 F.Supp. 121, 124–25 (E.D.N.Y. 1977). This principle, based on the need to prevent speculative recovery, cannot be evaded by the simple allegation that appellants sold something, be it security or non-security, to gain capital needed during the retention period. A contrary holding would substantially diminish the vitality of *Blue Chip Stamps*.

We conclude that appellants cannot show that they fulfill the statutory purchase and sale requirements necessary to invoke Rule 10b-5. We therefore turn to an evaluation of whether a federal claim may be premised on the violation of NYSE Rule 412.

### III

NYSE Rule 412, *see* note 3 *supra*, provides a mechanism for the orderly transfer of customers' accounts between member brokers. The rule provides that, upon written request of a customer to transfer his account, the receiving broker may submit a current statement of the account to the carrying broker. Within five days of receipt of this statement, the carrying broker must verify its accuracy. The receiving broker then, *at his option*, may call upon the carrying broker to complete the transfer within five days.

 Appellants contend that a private federal cause of action may be predicated on an exchange rule. They assert that appellees' violation of Rule 412 [14]

---

14. Appellees argue that appellants' factual allegations are insufficient to even establish a violation of Rule 412. *See* Brief for Appellees at 12–14. Specifically, they contend that appellants do not allege that Loeb, the receiving broker, exercised its option to require RSI to transfer within five days. *Id.* at 13–14. Failure to allege compliance with the procedural mechanism necessary to invoke the rule, appellees assert, renders reliance on it misplaced. *Id.*
We have studied appellants' pleadings, and we find the contents sufficiently allege a violation of Rule 412. *Conley v. Gibson*, 355 U.S. 41, 48, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); Rule 8(f), Federal Rules of Civil Procedure. *See* J.A. at 9, 10, 68; Reply Brief for Appellant at 2.

therefore renders their claim cognizable in federal court. *See* Brief for Appellants at 14–20. We agree that *some* exchange rules may provide the basis for a federal action, however, we do not believe Rule 412 is one of those rules.

Two lines of lower court cases have discussed the particular circumstances that may give rise to a federal right of action for violation of an exchange rule. The Second Circuit was the first specifically to address the issue. In *Colonial Realty Corp. v. Bache & Co.*, 358 F.2d 178 (2d Cir.), cert. denied, 385 U.S. 817, 87 S.Ct. 40, 17 L.Ed.2d 56 (1966), a securities customer brought suit against a NYSE member for losses resulting from the member's breach of an oral agreement not to require margins in excess of the NYSE's minimum requirements. The plaintiff alleged that this constituted, *inter alia*, a violation of a NYSE rule requiring brokers to conduct dealings with high standards of commercial honor, consistent with just and equitable principles of trade. *Id.* at 180; *see* NYSE Const. art. XIV, § 6; NYSE Rule 401. Judge Friendly, writing for the court, stated:

> [W]hether the courts are to imply federal civil liability for violation of exchange or dealer association rules by a member cannot be determined on [a] simplistic all-or-nothing basis . . . rather, the court must look to the nature of the particular rule and its place in the regulatory scheme, with the party urging the impli-

cation of a federal liability carrying a considerably heavier burden of persuasion than when violation is of the statute or an SEC regulation.

358 F.2d at 182. According to the Second Circuit, the case for imposition of private civil liability is the strongest when the rule is a "substitute for regulation by the SEC," and "imposes an explicit [legal] duty unknown to the common law." *Id.*

The Seventh Circuit has formulated different standards. In *Buttrey v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 410 F.2d 135 (7th Cir.), cert. denied, 396 U.S. 838, 90 S.Ct. 98, 24 L.Ed.2d 88 (1969), the trustee in bankruptcy for a securities corporation brought suit against a national brokerage firm that allowed the president of the bankrupt corporation to maintain cash and margin accounts for speculative purposes without inquiring into the source of his funds or discerning his financial responsibility. The court held that a violation of NYSE Rule 405, the "know-your-customer" rule,[15] provided the basis for a federal action. *Id.* at 142–43. The *Buttrey* court failed to determine whether Rule 405 imposed a duty unknown at common law or could be viewed as a substitute for Commission regulation. The court applied instead its own two-prong analysis. The first and "touchstone" determination, according to the Seventh Circuit, is whether the particular rule is designed " 'for the direct protection of investors.' " *Id.* at 142 (quoting

---

**15.** At the time of the *Buttrey* case, NYSE Rule 405 provided:

> Every member organization is required through a general partner or an officer who is a holder of voting stock to
>
> (1) Use due diligence to learn the essential facts relative to every customer, every order, every cash or margin account accepted or carried by such organization and every person holding power of attorney over any account accepted or carried by such organization.
>
> (2) Supervise diligently all accounts handled by registered representatives of the organization.
>
> (3) Specifically approve the opening of an account prior to or promptly after the completion of any transaction for the account of or with a customer, provided, however, that in the case of branch offices, the opening of

an account for a customer may be approved by the manager of such branch office but the action of such branch office manager shall within a reasonable time be approved by a general partner or an officer who is a holder of voting stock in the organization. The member, general partner or officer approving the opening of the account shall, prior to giving his approval, be personally informed as to the essential facts relative to the customer and to the nature of the proposed account and shall indicate his approval in writing on a document which is a part of the permanent records of his office or organization.

*See Buttrey v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 410 F.2d 135, 141 (7th Cir.), cert. denied, 396 U.S. 838, 90 S.Ct. 98, 24 L.Ed.2d 88 (1969).

Lowenfels, *Implied Liabilities Based Upon Stock Exchange Rules*, 66 Colum.L.Rev. 12, 29 (1966)). If so, the court then must determine whether the conduct involves more than mere errors of judgment or negligence and is "tantamount to fraud." *Id.* at 143.

As both appellants and appellees, emphasize, *see* Brief for Appellants at 14–20; Brief for Appellees at 14–20, conflicting criteria emerge from the *Colonial Realty* and *Buttrey* cases. *Colonial Realty* articulates a substitution test, which asks whether an exchange rule stands in place of a federal statute or rule. *Buttrey* emphasizes a public benefit standard, which focuses upon whether the exchange rule is designed for protection of the public. Appellants urge that we judge this case under the *Buttrey* test, *see* Brief for Appellants at 19; and appellees maintain that we should apply the *Colonial Realty* standard, *see* Brief for Appellees at 16–17.

Although we note the strong criticism levied against the *Buttrey* test by courts and commentators,[16] we need not adopt one test to the exclusion of the other. We are guided instead by the Supreme Court's recent decision, *Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 24–42, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977),[17] which specifically discusses the implication of private rights of action under the Act. The standards applied in that case embody elements of both the *Colonial Realty* and *Buttrey* tests, and we rely on the lower court cases only to the extent that they aid our application of the Supreme Court's analysis to this action.

In *Piper*, the Court held that a defeated tender offeror cannot maintain a suit under section 14(e) of the Act, 15 U.S.C. § 78n(e) (1976). The Court's refusal to imply a private action was premised upon an evaluation of the four factors set out in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975):

First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted" . . . that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law . . . .

*Id.* at 78, 95 S.Ct. at 2088 (citations omitted) (emphasis in original).

These factors are not intended as inflexible hurdles to be surmounted identically in each case. Indeed, the Court never refers to the factors collectively as "tests," nor does it mandate a wooden application of them. Rather, the factors provide general, analytical guidelines to be used in evaluating the appropriateness of implying a cause of action in a wide range of situations. Thus, although both *Piper* and *Cort* deal specifically with the implication of a private action from a federal statute, we believe the concerns of that inquiry, as reflected in the four factors, are equally pertinent here. We therefore adopt the *Cort* criteria, adapt them to an analysis of Rule 412, and proceed along the lines suggested by the Supreme Court.

First, we look to Rule 412 and consider whether it was adopted for the *especial* benefit of the investor. Although the final paragraph of the rule, *see* note 3 *supra*, manifests concern for the customer, that concern appears to have been of secondary importance. Appellants' own evidence demonstrates that promulgation of the rule was impelled primarily by a desire

---

**16.** *See, e. g., Zagari v. Dean Witter & Co.*, [1976] Fed.Sec.L.Rep. (CCH) ¶ 95,777; Wolfson & Russo, *The Stock Exchange Member: Liability for Violation of Stock Exchange Rules*, 58 Cal.L.Rev. 1120, 1130–31 (1970); Hoblin, *A Stock Broker's Implied Liability to Its Customer for Violation of a Rule of a Registered Stock Exchange*, 39 Fordham L.Rev. 253, 275–77

(1970); Note, *Civil Liability for Violation of NASD Rules: SEC v. First Securities Co.*, 121 U.Pa.L.Rev. 388, 396–97 (1972).

**17.** *See generally* Note, *Exchange Liability Under Section 6 of the Securities Exchange Act: The Eligible Plaintiff Problem*, 78 Colum.L.Rev. 112, 124–30 (1978).

to protect the receiving broker. The NYSE, in a letter soliciting Commission comment on Rule 412 before its enactment, stated that the rule was

> designed to establish a system for financial protection of both the customer and the receiving firm in the event that the transfer of a customer's account from one firm to another is unduly delayed. At present, such delays create a situation where the *receiving firm may incur a risk* in executing trades for the customer whose account is being transferred because it may not be possible to establish that securities sold or funds needed for purchase are on hand with the carrying broker.
>
> The proposed rule . . . *would permit the receiving firm to make transactions for the customer with financial protection.*

Joint Appendix (J.A.) at 103 (emphasis added).

Further, Rule 412 vests no rights in the customer. By its terms, the five-day rule is invoked completely *at the option* of the broker. There is no provision permitting the investor to compel implementation of the procedure, or to enforce compliance once the broker has invoked the rule. Although the NYSE intended some benefit to flow to the customer, we cannot conclude that Rule 412 exists for the primary, or *especial*, benefit of the investor. *See Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 477–78, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977); *Cort v. Ash*, 422 U.S. at 80–82, 95 S.Ct. 2080.

■ Next, we determine whether implication of a new cause of action is consistent with the structure and purposes of the Act. The Act is designed specifically for "the American people trading on . . . exchanges," 78 Cong.Rec. 2270 (1934) (remarks of Sen. Fletcher), and protection of the investing public is of primary concern.

*See, e. g.*, S.Rep. No. 792, 73d Cong., 2d Sess. 4 (1934); 78 Cong.Rec. 7921–22 (remarks of Rep. Maples). Congress anticipated three modes of securities control to achieve this goal: statutory provisions, Commission regulations, and exchange rules. Under this scheme, exchanges are imbued with quasi-governmental power and transformed from private trade associations into organizations sharing responsibility for maintenance of an orderly and fair securities market. In establishing this tripartite system, Congress specifically contemplated active self-regulation of the industry and the aggressive promulgation of exchange rules. *See Silver v. New York Stock Exchange*, 373 U.S. 341, 351–52, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963); S.Rep. No. 1455, 75th Cong., 3d Sess. 3–5 (1938); H.Rep. No. 2307, 75th Cong., 3d Sess. 4–6 (1938); H.Rep. No. 1383, 73d Cong., 2d Sess. 5 (1934).

■ Exchange rules are basically of two types. Some rules are merely "housekeeping devices," concerned with internal exchange organization and uniformity of procedure.[18] Although these rules indirectly benefit the customer, they are concerned with matters primarily of interest to exchange members. In contrast, other rules are promulgated directly for the protection of the investing public and regulate the kind of fraudulent conduct to which the Act is specifically directed.[19] These rules insure the integrity of the securities market, not simply the efficient functioning of exchanges. They often serve as *substitutes* for Commission regulations and are vital to effective securities control. Implication of a cause of action from them is not only permissible, but may be necessary to the success of the tripartite system. *See generally J. I. Case Co. v. Borak*, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964).

■ Rules intended as substitutes for Commission regulation, although not easily

---

**18.** *See, e. g.*, NYSE Const. arts. II–VII (composition and election of the Board of Governors); X (dues and other fees); XI (transfers of memberships); XVI–XVII (the Gratuity Fund); Rule 35 (registration of floor employees).

**19.** *See, e. g.*, NYSE Rule 325 (maintenance of adequate capital accounts); 408 (proper supervision of discretionary accounts); 452 (proxies).

categorized, may be: (1) those whose promulgation caused termination of Commission rulemaking proceedings, *see Colonial Realty Corp. v. Bache & Co.*, 358 F.2d at 182 n. 4; (2) those that the Commission is explicitly authorized, under section 19(b) of the Act, 15 U.S.C. § 78s(b) (1976), to modify if inadequate; (3) those adopted pursuant to Commission regulation, *see* 17 C.F.R. § 240.11a–1(7) (1977); 17 C.F.R. § 240.15c3–1(b)(2) (1977); or (4) those enacted at the suggestion of the Commission, *see Independent Broker-Dealers' Trade Association v. SEC*, 142 U.S.App.D.C. 384, 393–394, 442 F.2d 132, 141–42, *cert. denied*, 404 U.S. 828, 92 S.Ct. 63, 30 L.Ed.2d 57 (1971).

Appellants have failed to demonstrate that Rule 412 was intended to serve as a substitute for Commission regulation. Indeed, their evidence tends to prove the contrary. The NYSE provided initial motivation for the rule, and failed to adopt a suggested Commission modification.[20] *See* J.A. at 102–03. Rule 412 is more akin to a "housekeeping rule," one that suggests a uniform procedure for the orderly transfer of accounts, but one that cannot be deemed sufficiently related to the purposes of the Act to warrant implication of a federal claim. Were we to imply federal liability for all exchange rules, even those of a housekeeping nature, we would inhibit the vigorous promulgation of rules which is crucial to the success of the self-regulatory system. Emasculation of this carefully constructed system would thwart congressional intent. We therefore find that implication of a private federal right of action for violation of Rule 412 cannot be considered consistent with the structure and purposes of the Act.

Finally, we note that appellants have a sufficient remedy at common law

for either breach of contract or tort, two areas "traditionally relegated to state law." *Cort v. Ash*, 422 U.S. at 78, 95 S.Ct. 2080. An action brought under section 27 of the Act, 15 U.S.C. § 78aa, can be heard only in a federal court. Expansive implication of federal liability would displace adequate common law actions and undermine a state court's power to apply traditional remedies. The advantageous arbitration procedure, currently existing between customers and brokers, also would be effectively undermined. *See Starkman v. Seroussi*, 377 F.Supp. 518 (S.D.N.Y.1974). When existing remedies are sufficient, we need not reach to imply additional means of achieving congressional policy, and we decline to do so now. *See Santa Fe Industries, Inc. v. Green*, 430 U.S. at 477–78, 97 S.Ct. 1292; *Colonial Realty Corp. v. Bache & Co.*, 358 F.2d at 182; *Baird v. Franklin*, 141 F.2d 238, 244–45 (2d Cir.) (Clark, J., dissenting in part from the opinion, and from the judgment), *cert. denied*, 323 U.S. 737, 65 S.Ct. 38, 89 L.Ed. 591 (1944).

## IV

We conclude that appellants have failed to allege facts sufficient to state a federal claim. For the foregoing reasons, their complaint is not cognizable under Rule 10b-5, and NYSE Rule 412 does not provide a private federal right of action. In so ruling, however, we expressly do not preclude the possibility of state court relief, and we remind appellants of this alternative.[21]

*Affirmed.*

---

**20.** The Commission commented on proposed Rule 412 as follows:

> In order to provide incentive to the carrying broker to respond in accordance with the Rule, we suggest that you consider providing that the customer's statement will be deemed verified and a notice to transfer may be sent if the carrying broker does not respond within the five day period.

J.A. at 102. This suggestion is not reflected in the present text of the rule. *See* note 3 *supra.*

**21.** *See, e. g., Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 738–39 n. 9, 95 S.Ct. 1917, 1926, 1927, 44 L.Ed.2d 539 (1975); 3 L. Loss, Securities Regulations 1469–70 (2d ed. 1961).