1054

Wallace R. STEFFEN, Plaintiff,

v.

CONSOLIDATED RAIL
CORPORATION,
Defendant.

Civ. A. No. 84–08.

Special Court,
Regional Rail Reorganization Act.

July 19, 1988.

Wallace Steffen, pro se.

Harry Rissetto, Thomas Reinert and James Blair of Morgan, Lewis & Bockius, Washington, D.C., for defendant.

Before GASCH, Presiding Judge, and BRYANT and GREEN,* Judges.

## MEMORANDUM

GASCH, Presiding Judge:

In three counts, plaintiff asserts claims for breach of an employment agreement, derogation of vested rights, and age discrimination. Originally filed in the Northern District of Ohio, the action was enjoined by the Special Court because the complaint requires interpretation of various provisions of the Northeast Rail Service Act, Pub.L. No. 97–35, 95 Stat. 669 (1981) ("NRSA"). In 1984, Conrail moved to dismiss counts I and II for failure to state a claim and to dismiss count III, the age discrimination claim, as time-barred, beyond the jurisdiction of the Special Court, not ripe for judicial review, and waived. The Court declined to grant the motion because the facts recited by Steffen, in the light most favorable to him, plausibly stated a claim for breach of an employment agreement and arguably required interpretation of section 1144(a)(1) of NRSA. Memorandum Order at 3–4 (July 28, 1987).

---

* Pursuant to Rule 4 D of this Court, Judge Green is sitting in substitution for Judge Weiner who recused himself.

1. Section 502(b) provides:
   **Mandatory offer.** The Corporation shall offer employment, to be effective as of the date of a conveyance or discontinuance of service under the provisions of this Act, to each em-

Steffen now moves for summary judgment on all three counts, though he advises the Court that count II need only be considered if his claims on the other counts are rejected. In response, Conrail renews its motion to dismiss counts I and II and, alternatively, moves for summary judgment on those counts.

## I. BACKGROUND

Prior to April 1, 1976, Steffen was a staff attorney for the bankrupt Erie Lackawanna Railroad. As part of its acquisition of the rail property of bankrupt railroads, Conrail was obligated by the Regional Rail Reorganization Act, Pub.L. No. 93–236, § 502(b), 87 Stat. 1013 (1976) ("RRRA") (codified at 45 U.S.C. § 772(b) (1976)) (repealed by NRSA), to offer Steffen employment.[1] The offer was made to Steffen on February 25, 1976 in a form entitled "Memorandum of Statutory Protection Provisions Under Title V of the Regional Rail Reorganization Act and Consolidated Rail Corporation's Offer of Employment." Plaintiff's Appendix A, Exhibit 1 [hereinafter Employment Memorandum]. The Employment Memorandum contains seven labelled paragraphs, three of which are relevant to Steffen's claims.

Pursuant to the paragraph labelled "Offer of Employment," Steffen began serving as a General Solicitor for Conrail on April 1, 1976—the date that the rail property of the bankrupt railroads was conveyed to Conrail. His employment continued in the Cleveland Office of the Law Department until February 1, 1977. By a letter dated January 17, 1977, Steffen was informed that Conrail would consolidate its legal operations and abolish the position held by him. Plaintiff's Appendix A, Exhibit 2. The letter also indicated that Steffen was entitled to protection benefits under title V of the RRRA. Steffen's eligibility for

ployee of a railroad in reorganization in the region who has not already accepted an offer of employment by the Association (where applicable), an acquiring railroad, or the Corporation.... The Corporation shall apply to such employees the protective provisions of [title V of the RRRA].

these benefits was also indicated by a paragraph in the Employment Memorandum labelled "Protected Employee." [2]

At the time Steffen's position was abolished, section 505(b) of the RRRA afforded Steffen protection against the adverse impacts of acquisition of· Erie Lackawanna by Conrail:

> (b) A protected employee, who has been deprived of employment or adversely affected with respect to his compensation shall be entitled to a monthly displacement allowance....
>
> (c) The monthly displacement allowance provided for in subsection (b) ... shall continue until the attainment of age 65 by a protected employee with 5 or more years of service on the effective date of this Act ...: Provided, That such monthly displacement allowance shall terminate upon the protected employee's death, retirement, resignation, or dismissal for cause....

The third relevant paragraph of the Employment Memorandum, labelled "Displacement Allowance," describes the protection of section 505(b):

> If you are a protected employee and suffer· a reduction in your compensation after conveyance, your income will be protected by the allowance provisions of Section 505(b) of the Act. The allowance has a maximum of $2,500 per month.

> If you have 5 or more years of service as of January 2, 1974, you will be paid this allowance for as long as your income is reduced until you reach age 65....

By virtue of these provisions, Steffen received displacement allowance payments until September 1, 1981.[3]

Effective September 1, 1981, section 1144(a)(1) of NRSA repealed title V. As a consequence of this legislative action, Conrail discontinued displacement allowance payments to Steffen. On October 2, 1981, Conrail wrote to Steffen to inform him of the effect of NRSA on his displacement allowance and other benefits under title V of the RRRA.

## II. DISCUSSION

Of the three counts devised by Steffen, this Court has jurisdiction entirely over counts I and II and over an issue relevant to count III. The jurisdiction of the Special Court extends, *inter alia*, to civil actions:

> (1) for injunctive, declaratory, or other relief relating to the enforcement, operation, execution, or interpretation of any provision of or amendment made by [NRSA]....

NRSA § 1152(a) (codified at 45 U.S.C. § 1105(a)). Steffen's claims of breach of employment agreement and derogation of vested rights plainly demand interpretation of the repeal by NRSA of benefits under title V of the RRRA.[4] Memorandum Order

---

**2.** This paragraph defined protected employees as those employed by the bankrupt railroads on January 2, 1974, still employed on April 1, 1976, and not yet 65 years of age on the April date.

**3.** In 1978, Steffen's employment relationship with Conrail was briefly terminated when he rejected an offer for transfer to a clerk's position in Philadelphia at a salary of $16,200. Conrail offered, as an alternative, termination of Steffen as a Conrail employee and a stipend of $20,000. Steffen accepted the alternative with the proviso that the propriety of Conrail's offer be submitted to arbitration. The arbitrator declared Conrail's offer improper and ordered that Steffen be reinstated. Following this order, Steffen again received displacement allowance payments.

**4.** Steffen expressly denies that he is challenging the repeal of title V by section 1144 of NRSA. Plaintiff's Memorandum in Support of Motion for Summary Judgment at 10 [hereinafter Plain-

tiff's Memorandum]. He also states incorrectly that the Special Court determined in Civil Action No. 82–27 that it has original and exclusive jurisdiction over the age discrimination claim (count III). In a memorandum order filed on August 2, 1984, the Court stated:

> [T]he court finds that prosecution of [the age discrimination claim] ... should be temporarily enjoined. Steffen alleges, in essence, that his termination in 1981 was the culmination of a series of discriminatory acts. Conrail asserts that, on the contrary, the cutoff of Steffen's benefits and his consequent termination were mandated by NRSA. Conrail thus seems to have a high probability of success in showing that the age discrimination claim "relat[es] to the enforcement, operation, execution, or interpretation" of NRSA provisions, which is the only matter at issue. In addition, permitting the Ohio action to proceed would create *the risk of interpretations* of NRSA that *conflict with those of this court.*

at 3, *Conrail v. Steffen,* Civil Action No. 82–27 (Aug. 2, 1984). Because the age discrimination claim depends on the effect of NRSA on Steffen's relationship with Conrail, that claim too is partially within the jurisdiction of this Court. After this effect has been isolated and described by the Court, the remainder of the age discrimination claim, if any, will lie beyond the Court's jurisdictional grasp.

### A. Conrail Made No Promise to Employ Steffen Until Age 65

■ In Count I of his complaint and in his various memoranda, Steffen explains his breach of employment agreement claim as premised on a promise by Conrail to employ him until he reached the age of 65. In Steffen's view, the genesis of this promise was in a paragraph of the Employment Memorandum labelled "Displacement Allowance." As quoted above, the paragraph explains the protection afforded by title V of the RRRA. Section 505(b) of that Act guaranteed a minimum income to employees displaced from their jobs as a result of the conveyance of rail property from the bankrupt railroads to Conrail. For an employee like Steffen, the benefits of section 505(b) were statutorily required to be paid by Conrail until he reached the age of 65.

Steffen's theory is that this paragraph did more than recite the statutory benefits available to a displaced employee. He argues that by this language, Conrail promised to retain him as an employee until he reached 65. The argument is entirely unfounded.

■ The paragraph of the Employment Memorandum upon which Steffen relies does no more than paraphrase the provisions of section 505(b) of the RRRA. The language clearly explains that the displacement allowance is based on that statute. At most, Conrail's explanation of section 505(b) is a reiteration of an obligation voluntarily undertaken by Congress to assist displaced railroad employees—an obligation Congress was free to annul. *See Railway Labor Executives' Association v. United States ("RLEA"),* 575 F.Supp. 1554, 1557 (Regional Rail Reorg.Ct.1983) (Congress did not intend title V to bind Conrail contractually to provide displacement allowance benefits).[5] Moreover, *RLEA* makes clear that NRSA supersedes any private contractual relationship into which Conrail may have entered. *Id.* at 1559.

■ Arguing in the alternative, Steffen cites several assurances by Conrail that every effort would be made to place him in a position with the railroad commensurate with his many years of experience as a railroad attorney. With these statements as his building blocks, Steffen erects a rickety theory of promissory estoppel. Steffen relies particularly on two boilerplate correspondences to him from Conrail. In the first, dated February 25, 1976—one month before Steffen became a Conrail employee—Conrail stated:

> We have adopted personnel planning procedures which will insure that no qualified candidate on any of the conveyed railroads will be overlooked in staffing the new Company.
>
> While it is our objective to hold down protection costs, consistent with sound business practices, it will be done by objectively evaluating the needs of the individual with the efficiency require-

---

Memorandum Order at 3–4, *Conrail v. Steffen,* Civil Action No. 82–27. By this order, the Special Court clearly reserved determination of whether the age discrimination claim is within its jurisdiction.

5. In apparent recognition of the holding in *RLEA,* plaintiff disavows several corollaries of his breach of agreement theory:

> Plaintiff does not seek contractual or statutory benefits under the [RRRA] or NRSA. Plaintiff does not claim that Title V provisions were incorporated into the "age–65" agreement [Employment Memorandum]. Plaintiff

does not claim that any statute incorporates the "age–65" agreement and thus makes the statute a contract. Plaintiff does not challenge the repeal of title V of the [RRRA].
> Plaintiff does not claim any contractual relationship with [the] United States with respect to employment with ConRail.... Plaintiff does not seek any Title V "protective" benefits.

Plaintiff's Memorandum at 10–11. These disclaimers entirely eviscerate Steffen's theory that Conrail breached an express promise to employ him until age 65.

ments of ConRail. People will be assigned so their capabilities will be utilized effectively.

Letter from Edward G. Jordan, Chairman and Chief Executive Officer of Conrail to All Non–Agreement Employees Protected Under the Provisions of the Regional Rail Reorganization Act of 1973, As Amended (Feb. 25, 1976). In a letter dated July 18, 1977—approximately five months after Steffen's position was abolished—Conrail reiterated its desire to reassign displaced employees if possible:

> It has been stated in previous correspondence to you that it is the intention of Conrail to reassign those surplus employees whose skills can be effectively utilized as new or vacated positions become available.

Letter from B.N. Robinson, Assistant Vice President, Personnel, Conrail to W.R. Steffen (July 18, 1977). From these statements, Steffen gleans a promise by Conrail to employ him until he reached age 65.

Though the argument is nearly ethereal, it requires determination by a jury of the reasonable meaning of Conrail's statements. *See Mers v. Dispatch Printing Co.,* 19 Ohio St.3d 100, 483 N.E.2d 150, 155 (Ohio 1985) ("meaning of Dispatch's promise, and whether the acts flowing from it were reasonable, are questions of fact for jury determination").[6] The parties obviously dispute this material issue of fact which dispute precludes summary judgment. Because this Court is incapable of trying Steffen's claim to a jury, his action in the Northern District of Ohio should be permitted to proceed on the issue of promissory estoppel.

**6.** Steffen contends without opposition from Conrail that Ohio law will govern his claims. Inasmuch as Steffen was employed in Ohio, this assertion is reasonable.

**7.** In large part, this "vested rights" claim is Steffen's breach of employment agreement claim dressed in different legal garb. Throughout his pleadings and memoranda, Steffen describes his entitlement to the displacement benefits as a vested right. Nowhere does he explain, however, the distinction between this vested right

### B. *Steffen Has No Vested Right to Displacement Allowance Benefits*

In count II of his complaint, Steffen claims that on February 1, 1977—the date his position with Conrail was abolished— his "settled expectation" of protection from employment displacement became vested. He insists that the Employment Memorandum precluded divestment of that protection except upon his death, retirement, resignation, or dismissal for cause.[7] Though Steffen repeatedly denies any connection between this "vested right" and benefits once available under title V of the RRRA, he identifies only the Employment Memorandum and title V, to which the Memorandum expressly refers, as possible sources for the expectation that displacement allowance payments would be made to him until he reached age 65. If the latter is his theory, then count II is simply a challenge to the repeal of title V wrapped in a gossamer that Steffen calls a "vested right." Precisely this challenge was unequivocally rejected in *RLEA.* 575 F.Supp. at 1558.

Though Steffen does not say so, count II may alternatively be read as a due process attack upon the elimination of his displacement allowance benefits. Steffen's reference to his "settled expectation" of such benefits is reminiscent of claims pressed in *United Transportation Union v. Consolidated Rail Corp. ("UTU"),* 535 F.Supp. 697 (Regional Rail Reorg.Ct.1982). Noting that various provisions of NRSA negated job security provisions in a collective bargaining agreement with Conrail, the Union contended that Congress had confiscated the property rights of Union members without just compensation. For several reasons, the Court rejected the argument, relying particularly on "'the competence of Congress to allocate the interlocking eco-

and the contractual right upon which count I is founded. His memorandum in support of summary judgment suggests that the vested right derives from title V of the RRRA, Plaintiff's Memorandum at 37, but several paragraphs later he expressly disavows this theory. *Id.* at 38–39. Perhaps, count II is analogous to the claims asserted in *United Transportation Union v. Consolidated Rail Corp.,* 535 F.Supp. 697, 705– 09 (Regional Rail Reorg.Ct.1982). This possibility is discussed *infra.*

nomic rights and duties of employers and employees ... regardless of contravening arrangements between employer and employee.'" *Id.* at 708 (quoting *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976)). The Court concluded that "[r]ailway labor could hardly have had 'settled expectations' that Congress would forever refrain from doing away with jobs which a presidential commission had found to be useless twenty years ago." *Id.*

The issue was again presented to the Court in *RLEA,* though apparently masked as a claim that a collective bargaining agreement incorporated title V. Based upon this incorporation, the plaintiff insisted that its members were entitled to title V benefits as a matter of contract, wholly apart from legislative rescission of title V. 575 F.Supp. at 1558. Citing *UTU,* the Court reiterated the principal that "acts of Congress override inconsistent private contracts." *Id.* at 1559 (citations omitted); *see Railway Labor Executives' Association v. Grand Trunk Western R. Co.,* 594 F.Supp. 758, 760–61 (Regional Rail Reorg.Ct.1984).

■ The reasoning and principles relied upon in *UTU* and *RLEA* are entirely dispositive of Steffen's contention that his contract with Conrail guaranteed to him displacement allowance benefits despite the repeal of title V. Upon no set of facts may Steffen demonstrate any "vested right" to such benefits. Because the Court has considered affidavits and evidence extrinsic to the pleadings, summary judgment in Conrail's favor on count II is proper. *See* Fed.R.Civ.P. 12(b) (dismissal for failure to state claim becomes summary judgment if extrinsic materials examined by court); *District of Columbia v. Air Florida, Inc.,* 750 F.2d 1077, 1081 (D.C.Cir.1984); *Sacks*

*v. Reynolds Securities, Inc.,* 593 F.2d 1234, 1239 (D.C.Cir.1978).

## C. NRSA Did Not Compel Conrail to Terminate Steffen

In an order filed July 27, 1987, the Court characterized count III as an attempt by Steffen "to show [that] his status as an employee was terminated in September 1981, as a result of the § 1144(a)(1) repeal of Title V." Memorandum Order at 3–4. The Court added that "an interpretation of that section of NRSA may be necessary to determine the timeliness of plaintiff's ADEA claim." *Id.* In fact, neither his complaint nor his summary judgment memoranda assert that NRSA compelled his discharge. The age discrimination claim is based on the hiring by Conrail after February 1, 1977 of numerous attorneys under the age of forty, unprotected by title V, and inexperienced in railroad law.[8] Steffen insists that Conrail refused to offer him a position in the railroad's law department solely because of his age.

One of Conrail's defenses to the ADEA claim, however, does require a declaration by this Court whether repeal of title V benefits necessarily required the termination of Steffen's employment with Conrail. The railroad argues that NRSA merely substituted less substantial benefits for the displacement allowance previously afforded by title V. Thus, Conrail implies that if Steffen's relationship with Conrail was terminated, it was at his behest or required by statute.[9] Partially reiterating his breach of employment agreement claim, Steffen argues that Conrail terminated the employment relationship by discontinuing displacement payments after August 31, 1981.

---

**8.** Steffen variously describes the discriminatory act as "unlawful involuntary retirement," "unlawful refusal to rehire," "discrimination with respect to privileges of employment," and "age discrimination." Only the last of these appears in his complaint.

**9.** The railroad argues that Steffen either was discharged on February 1, 1977 when his position was abolished or was never discharged. If the former were true, Steffen's claim may be stale; under the latter scenario, he would be unable to demonstrate an essential element of an age discrimination claim—discharge. As explained below, NRSA merely replaced title V benefits with less costly income subsidies. Any change in the employment relationship was a consequence of actions taken by Steffen under the incorrect assumption that he was contractually entitled to title V benefits.

Though section 1144(a)(1) of NRSA eliminates the displacement benefits created by title V of the RRRA, the preceding section of NRSA mandated substituted income assistance for protected employees:[10]

(a) General. (1) The Secretary of Labor and the representatives of the various classes and crafts of employees of the Corporation shall, not later than 90 days after the effective date of this title, enter into an agreement providing protection for employees of the Corporation who were protected by the compensatory provisions of title V of [the RRRA] immediately prior to the effective date of [NRSA] and who are, or may be, deprived of employment by actions taken under [the RRRA] and [NRSA].

NRSA § 1143 (codified at 45 U.S.C. § 797; designated by NRSA as 45 U.S.C. § 701). The resulting agreement permitted employees such as Steffen to:

elect either (a) to resign and accept a termination allowance under Article III of [the agreement], or (b) to retain customary privileges associated with the prior employment relationship with the employer and receive any benefits for which the [employee] may be eligible under Article IV.

Benefit Schedule Covering Non–Agreement Employees of the Consolidated Rail Corporation: Prescribed Pursuant to Section 701 of the Regional Rail Reorganization Act of 1973, As Amended § 201 (Dec. 11, 1981) (Exhibit 2 to Affidavit of William McCain, Assistant to the Vice President, Labor Relations, Conrail) [hereinafter Benefit Schedule]. By making an election and accepting the benefits described in section 201 of the Benefit Schedule, an employee would:

be deemed to waive any employee protection benefits otherwise available under any other provision of law or any contract or agreement in effect on [August

13, 1981], ... and *shall be deemed to waive any cause of action for any alleged loss of benefits resulting from the provisions of or the amendments made by [NRSA].*

45 U.S.C. § 797d(a)(1) (emphasis added); *see also* Benefit Schedule § 202(d). Though section 201 of the Benefit Schedule suggested that election was voluntary, section 203(c) construed "[f]ailure to make the election by timely filing written notice [as] an election to receive benefits under Article IV and a claim for benefits under section 403." Article IV authorizes a subsistence allowance of approximately $200 per week for no more than five years, and section 403 of the Benefit Schedule authorizes continued health and welfare benefits for no more than nineteen months.

Unwilling to waive any contractual right or cause of action, Steffen declined to make an election and instructed the Secretary of Labor to withhold benefits to which he might be entitled under the Benefit Schedule:

I do not wish to waive any ... protection benefits or cause of action. I hereby request that I not be provided with any benefits under NERSA which could be deemed a basis for a waiver. Will you please make this request known to the appropriate person and arrange to immediately stop such benefits on my behalf, including health and welfare coverage.

Letter from Wallace Steffen to Thomas H. Roadley, United States Department of Labor 1 (Dec. 26, 1981).[11] The letter indicates that Steffen's action was based on his belief that the Employment Memorandum guaranteed that "if [he] were to be deprived of employment, [his] income would be partially protected until [he] reached the age of 65." *Id.* Because the Court finds

---

10. "Protected employees" are those who were entitled to displacement allowance payments under title V. Any employee who was working on January 2, 1974 for one of the railroads acquired by Conrail, was under the age of 65 on that date, and was still employed by that railroad on April 1, 1976 is a protected employee. 45 U.S.C. § 771(3)(B) (repealed by NRSA). Steffen is a "protected employee."

11. In this letter, Steffen also requested an enlargement of time within which to make the election required by the Benefit Schedule. The election was required to be made by March 11, 1982, but extensions were authorized at the discretion of the Railroad Retirement Board. *See* Benefit Schedule § 203(c).

that no such guarantee was made by Conrail, the effect of NRSA on Steffen's relationship with Conrail becomes pivotal to the age discrimination claim. If NRSA did not affect that relationship, then the age discrimination claim is susceptible to attack by Conrail as untimely or not ripe.[12]

By its language, NRSA does no more than substitute the lifetime job displacement benefits of title V with time-limited subsistence benefits or with a one-time termination allowance. Because the employee has the option to choose either of these replacement benefits, NRSA cannot be said to mandate the discharge of an employee covered by the Benefit Schedule. If Steffen's employment relationship with Conrail changed on September 1, 1981, it did so entirely at Steffen's instigation.

## III. CONCLUSION

Though the many memoranda filed regarding the motions to dismiss and for summary judgment have muddled the issues in this case, it is at least evident that Conrail did not discharge Steffen on September 1, 1981 and breached no agreement by discontinuing title V benefits. The Employment Memorandum upon which Steffen so heavily relies merely reported the provisions of title V of the RRRA as they existed in 1977. Moreover, this Court made clear in *RLEA* that NRSA superseded any alleged private contractual obligation of Conrail to provide displacement allowance benefits. That case also disposes of Steffen's claim of "derogation of vested rights"; title V benefits were simply a form of social welfare bestowed and freely withdrawn by Congress. Finally, NRSA had no effect on Steffen's employment relationship with Conrail. Any change in the relationship occurred in 1977 when Steffen's position in the law department was abolished or in 1981 when Steffen voluntarily refused to make an election as required by NRSA. Whether Steffen's age discrimi-

nation claim survives these findings is for determination by the District Court in the Northern District of Ohio. Also remaining for consideration by that court, if the complaint is read as amended by Steffen's memoranda, is the promissory estoppel theory.

---

12. If NRSA did mandate the termination of Steffen as a Conrail employee, Steffen's age discrimination claim is also frustrated. Under such circumstances, Conrail would have an excellent defense to Steffen's charge that his termination was motivated by discriminatory animus. Perhaps for this reason, Steffen insists that NRSA is irrelevant to his claim. Regardless, Steffen is caught between the Scylla of this possible defense and the Charybdis of the statute of limitations.