Andre BIROTTE, Plaintiff,

v.

MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., a Corporation authorized to do business in the State of New Jersey, and Frank J. Fierro, Defendants.

Civ. A. No. 78–469.

United States District Court,
D. New Jersey.

April 11, 1979.

Blume & Weiseman by Clark Alpert, Newark, N. J., for plaintiff.

Moore & Howell by John L. Moore, Morristown, N. J., for defendants.

## OPINION

MEANOR, District Judge.

Presently before the court are motions by the defendants for a partial summary judgment or, alternatively, to dismiss certain counts of the complaint for failure to state a claim upon which relief can be granted.

## INTRODUCTION

On January 17, 1977, plaintiff filed Civil Action No. 77–105 in this court. The matter was assigned to Judge Frederick B. Lacey. After the case had been pretried before U. S. Magistrate William J. Hunt and was scheduled for trial, plaintiff moved to amend his complaint. While the original complaint basically alleged violations of certain provisions of the Securities Exchange Act of 1934 and SEC Rule 10b–5, the proposed amended complaint added claims for violations of Federal Reserve Regulation T, violations of the Rules of the New York Stock Exchange (NYSE), the Chicago Board of Options Exchange (CBOE), and violations of the New Jersey Uniform Securities Law. In connection with the motion to amend the complaint, plaintiff's attorney filed an affidavit to which was annexed, as an exhibit, the report of his expert Warren H. Bree, dated February 14, 1978. The Bree report identifies particular transactions in plaintiff's brokerage account which are alleged to be in violation of Regulation T and various rules of those exchanges. On March 9, 1978, the parties entered into a stipulation which noted the court's denial of plaintiff's motion to amend the complaint, and voluntary dismissal of Civil Action No. 77–105 without prejudice. An Order formally denying the motion to amend the complaint was filed on March 13, 1978. On March 9, 1978, the date the stipulation was entered into by the parties, plaintiff filed the complaint in this action, Civil No. 78–469. This complaint is an exact replica of the proposed amended complaint in Civil No. 77–105. The matter was assigned to Judge Lacey. By memorandum of March 21, 1978, Judge Lacey requested the Clerk of the Court to reassign the newly filed case to another judge. On March 23, 1978, then Chief Judge Whipple reassigned the matter to me.

### I

### THE FACTS

This is an action for damages filed by Andre Birotte against Merrill Lynch, Pierce, Fenner & Smith, Inc., and its employee Frank J. Fierro. The complaint alleges the use of deceptive practices and fraudulent advice in violation of Rule 10b–5; churning; violations of the NYSE and

CBOE Rules regarding suitability, margin maintenance requirements, and the registration and supervision of employees; violations of Federal Reserve Regulation T; and violations of the New Jersey Uniform Securities Law. Defendants have answered with denials of any violations or wrongdoing in connection with their handling of plaintiff's account. Additionally, defendants have asserted numerous affirmative defenses including the statute of limitations.

The stipulation entered into by the parties in the earlier case provided: "Defendants will not assert any statute of limitations defenses to the causes of action set forth in the new litigation which duplicate the causes of action alleged against defendants in this [Civ. No. 77–105] litigation." See Appendix A (Stipulation). Plaintiff alleges that violations of duty by defendants constituted a course of conduct continuing at least until the end of plaintiff's account with defendants in April 1976. See Complaint, First Count at ¶ 5. Plaintiff further urges that defendants' course of conduct very likely continued until the Bree report enabled plaintiff to discern the nature of the violations alleged. Plaintiff's Brief at 1.

As a brokerage customer of defendant Merrill Lynch, plaintiff had an account in defendant's Newark, New Jersey office from October 1974 through April 1976, and an account in one of defendant's New York offices from May through December 1975. Complaint, First Count at ¶ 5. Defendant Fierro is the Registered Representative in defendant's Newark office who handled plaintiff's account there. Complaint, First Count at ¶¶ 3, 5. Defendants have moved alternatively for summary judgment or dismissal of the Second, Third, Fourth and Eighth Counts of the complaint. Each of these counts incorporates by reference the First Count which alleges the basic 10b–5 claim of deceptive practices and fraudulent advice in the management of plaintiff's account.

## II

## THE SECOND COUNT AND NYSE RULE 405

In the Second Count of the complaint, plaintiff alleges that defendants are subject to the Rules of the New York Stock Exchange and, during the period of management of plaintiff's account, defendants violated NYSE Rule 405 in failing to properly exercise due diligence· in handling the account. NYSE Rule 405 is the so-called "Know Your Customer" rule.[1] The thrust of the Rule is that brokerage firms which are members of the NYSE must use due diligence to learn the essential facts relative to every customer, every order and every account carried by the member firm; supervise each account handled by its registered representatives; and approve the opening of all new accounts. Plaintiff alleges that defendants violated this Rule and are thus liable for damages flowing from such violation. At issue is whether violation of this Rule gives plaintiff a private right of action.

There is a split among the Circuits as to whether violations of the stock exchange rules give rise to such action. The two major lines of thought arise from the Second and Seventh Circuits. The Second Circuit was the first Court of Appeals to address the issue of what particular circumstances may give rise to a federal cause of action for violation of an exchange rule. In

---

1. Rule 405 states in pertinent part:
   Every member organization is required . . . to
   (1) Use due diligence to learn the essential facts relative to every customer, every order, every cash or margin account accepted or carried by such organization and every person holding power of attorney over any account accepted or carried by such organization.

   (2) Supervise diligently all accounts handled by registered representatives of the organization.
   (3) Specifically approve the opening of an account prior to or promptly after the completion of any transaction for the account of or with a customer . . . . .
   New York Stock Exchange Guide (CCH) Rule 405, at 3697 (1978).

*Colonial Realty Corp. v. Bache & Co.*, 358 F.2d 178 (2d Cir.), *cert. denied*, 385 U.S. 817, 87 S.Ct. 40, 17 L.Ed.2d 56 (1966), Judge Friendly stated:

> [W]hether the courts are to imply federal civil liability for violation of exchange or dealer association rules by a member cannot be determined on [a] simplistic all-or-nothing basis . . . rather, the court must look to the nature of the particular rule and its place in the regulatory scheme, with the party urging the implication of a federal liability carrying a considerably heavier burden of persuasion than when the violation is of the statute or an SEC regulation.

358 F.2d at 182. The *Colonial Realty* Court rejected a private implied cause of action for violation of Article III, section 1, of the Rules of Fair Practice of the National Association of Securities Dealers. Section 2 of that Article, "The Suitability Rule" is closely analogous to NYSE Rule 405.[2] The court recognized that the Securities Exchange Act of 1934 did not specifically authorize actions for violation of private association rules, but said that it would recognize an implied cause of action where the rule violated; first, amounted to a substitute for an SEC regulation, and second, established an explicit duty unknown to the common law. 358 F.2d at 182; *see Utah State University v. Bear Stearns & Co.*, 549 F.2d 164, 167 (10th Cir. 1977).

The Seventh Circuit, in *Buttrey v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 410 F.2d 135 (7th Cir.), *cert. denied*, 396 U.S. 838, 90 S.Ct. 98, 24 L.Ed.2d 88 (1969), recognized an implied cause of action under NYSE Rule 405. That Court stated that a determination of whether a violation of a rule is actionable depends on whether its design is "for the direct protection of investors," and said that one of the functions of Rule 405 was the protection of the public. 410 F.2d at 142.[3] The *Buttrey* Court failed to determine whether Rule 405 imposed a duty unknown at common law or could be viewed as a substitute for Commission regulation. *Sacks v. Reynolds Securities, Inc.*, 193 U.S.App.D.C. 80, 88, 593 F.2d 1234, 1242 (1978). The two-prong *Buttrey* test asks: (1) is the rule designed for the direct protection of investors?, and if so (2) does the conduct involve more than mere errors of judgment or negligence so as to be tantamount to fraud. *Buttrey, supra*, 410 F.2d at 143.

The *Buttrey* case has been the subject of vigorous criticism by courts and commentators.[4] These critics have pointed out that Rule 405 was not promulgated to protect customers from shady brokers but rather to protect brokers from unscrupulous customers. *Utah State University, supra*, 549 F.2d at 167. This criticism has its basis in SEC, Report of Special Study of Securities Markets of the Securities and Exchange Com-

---

**2.** Article III, Section 2 of the Rules of Fair Practice adopted by NASD, the "Suitability Rule" provides:

> In recommending to a customer the purchase, sale or exchange of any security a member shall have reasonable grounds for believing that the recommendation is suitable for such customer upon the basis of the facts, if any, disclosed by such customer as to his other security holdings and as to his financial situation and needs.

Cited in *Scarfarotti v. Bache & Co., Inc.*, 438 F.Supp. 199, 208 (S.D.N.Y.1977).

**3.** The language of the *Buttrey* Court in stating that the function of Rule 405 is to protect the public has been pointed out to be dicta, since the activity complained of in that case was found to be in violation of section 17 of the Securities Act of 1933, 15 U.S.C. § 77q, and Rule 10b–5 of the SEC, 17 C.F.R. § 240.10b–5, promulgated under section 10 of the 1934 Act,

15 U.S.C. § 78j. *McMaster Hutchinson & Co. v. Rothchild & Co.*, [1972] Fed.Sec.L.Rep. (CCH) ¶ 93,541 (N.D.Ill.1972).

**4.** *See, e. g., Zagari v. Dean Witter & Co.*, [1976] Fed.Sec.L.Rep. (CCH) ¶ 95,777 (N.D.Cal.1976); *McMaster Hutchinson & Co. v. Rothchild & Co.*, [1972] Fed.Sec.L.Rep. (CCH) ¶ 93,541 (N.D.Ill.1972); *Aetna Casualty & Surety Co. v. Paine, Webber, Jackson & Curtis*, [1970] Fed. Sec.L.Rep. (CCH) ¶ 92,748 (N.D.Ill.1970); Hoblin, A Stockbroker's Implied Liability to Its Customer for Violation of a Rule of a Registered Stock Exchange, 39 Fordham L.Rev. 253, 275–77 (1970); Wolfson & Russo, The Stock Exchange Member: Liability for Violation of Stock Exchange Rules, 58 Cal.L.Rev. 1120, 1130–31 (1970); Note, Civil Liability for Violation of NASD Rules: *SEC v. First Securities Co.*, 121 U.Pa.L.Rev. 388, 396–97 (1972).

mission, H.R.Doc.No.95, 88th Cong. 1st Sess., pt. 1 at 316 (1963). *Id.* at 167–168.

The complaint in *Buttrey* alleged fraudulent conversion of securities. On those facts that Court recognized a private civil damage action. It did not say, however, that an alleged violation of Rule 405 was *per se* actionable. *Buttrey, supra*, 410 F.2d at 143. The facts alleged in this complaint in the Second Count make no specific allegations of fraudulent conversion or any fraud at all—only that defendants failed to exercise due diligence in the supervision of plaintiff's account, as required by Rule 405. The allegation can best be construed as negligence, and is certainly not tantamount to the fraud alleged in *Buttrey.* The fact that plaintiff has incorporated by reference in the .Second Count the allegations of fraud contained in the First Count is insufficient to sustain a claim for fraud. The circumstances constituting fraud must be stated with particularity. *Fed.R.Civ.P.* 9(b). The Court of Appeals for the Tenth Circuit noted in holding that violations of exchange rules do not give rise to a private cause of action:

> No different result is mandated by joining the rule violations with a Rule 10b–5 claim. It adds nothing to combine the allegations. The conclusory statement in this complaint that the violations of the exchange and association rules "operated as a fraud and deceit upon the plaintiffs" is insufficient to sustain a claim of fraud or deceit.

*Utah State University, supra,* 549 F.2d at 171.

In *Landy v. Federal Deposit Insurance Corp.,* 486 F.2d 139 (3d Cir. 1973), *cert. denied,* 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974), the Court of Appeals for the Third Circuit found it unnecessary to decide whether a private right of action should be implied under Rule 405, although it stated in a footnote that

implication of liability should be done reluctantly [with respect to stock exchange rules] for the following reasons: first, accurate evaluation of the degree to which any particular rule represents SEC policy is often difficult, if not impossible; . . . second, imposition of liability might chill the process of self-regulation by creating fear of damaging liability; and, finally as appellees argue, exchange rules are not promulgated by a government body after careful deliberation and weighing of the variegated competing public interests.

486 F.2d at 166 n. 23. In *Van Alen v. Dominick & Dominick, Inc.,* 560 F.2d 547, 552–53 (2d Cir. 1977), the Second Circuit, while not reaching the issue whether Rule 405 gives rise to a private action against an exchange member, noted that it remains an open question in that Circuit.

In *Utah State University, supra,* the Tenth Circuit found that no provision of the Securities Exchange Act creates an express civil remedy for violation of an exchange or association rule. 549 F.2d at 168. The Court of Appeals for the District of Columbia Circuit in *Sacks, supra,* noted "that *some* exchange rules may provide the basis for a federal action." *Sacks v. Reynolds Securities, Inc., supra,* 193 U.S.App.D.C. at 88, 593 F.2d at 1242 (emphasis in original). After analyzing the standards and tests of *Colonial Realty* and *Buttrey,* the *Sacks* Court turned for guidance to the Supreme Court's decision in *Piper v. Chris-Craft Industries, Inc.,* 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977), which specifically discusses the implication of private rights of action under the Securities Exchange Act, and *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), which set out the test for determining whether a private remedy is implicit in a statute not expressly providing for one.[5]

The *Cort* test sets out four factors:

---

5. Beginning in 1946 in *Kardon v. National Gypsum Co.,* 69 F.Supp. 512 (E.D.Pa.1946), when a District Court in the Eastern District of Pennsylvania first found an implied right of action under Rule 10b–5, there accelerated an affirma-

tive judicial response to the scope and number of cases implying private rights of action under the federal securities laws. *See* Pitt, Standing to Sue Under the Williams Act After Chris-Craft: A Leaky Ship on Troubled Waters, 34

First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted," . . . that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law . . . ?

422 U.S. at 78, 95 S.Ct. at 2088 (citations omitted) (emphasis in original).

The District of Columbia Circuit noted that these factors are not intended as inflexible hurdles to be surmounted identically in each case but, rather, they are general analytical guidelines to be used in evaluating the appropriateness of implying a cause of action in a wide range of situations. *Sacks, supra,* 193 U.S.App.D.C. at 89, 593 F.2d at 1243. (The *Sacks* Court specifically found no private federal right of action for violation of NYSE Rule 412.)

Applying the *Cort* factors to the case at bar requires that this court first look to Rule 405 and consider whether it was adopted for the *especial* benefit of the investor. The *Buttrey* case has so held in dicta, and the great criticism of *Buttrey* has been on this issue. *See, e. g., Utah State University, supra; Sacks, supra* and cases and commentaries cited therein. In both *Aetna Casualty & Surety Co. v. Paine,*

*Webber, Jackson & Curtis,* [1970] Fed.Sec.L. Rep. (CCH) ¶ 92,748 (N.D.Ill.1970), and *McMaster Hutchinson & Co. v. Rothchild & Co.,* [1972] Fed.Sec.L.Rep. (CCH) ¶ 93,541 (N.D.Ill.1972), the courts distinguished their own Circuit's decision in *Buttrey* and held that Rule 405 violations would not constitute a federal cause of action under the Securities Exchange Act of 1934. The facts in *Buttrey* are inapposite to the case at bar. In *Buttrey,* the Court pointed specifically to the charge that the defendant broker knew a fraud was being committed, and aided and abetted the fraud. *See Aetna Casualty, supra.* Here, the allegations of the Second Count charge defendants with failure to exercise the duty required under Rule 405. This failure, if proven, clearly is not tantamount to the fraud alleged in *Buttrey* which was the basis for the creation of a private right of action in that case.

Next to be determined is whether the implication of a new cause of action under Rule 405 is consistent with the structure and purpose of the Securities Exchange Act, and whether the Congress either expressly or implicitly intended to create or deny such a cause of action. The Court of Appeals for the District of Columbia Circuit in *Sacks, supra,* noted that the Act is designed specifically for "the American people trading on . . . exchanges," 78 Cong. Rec. 2270 (1934) (remarks of Senator Fletcher), and that the protection of the investing public is of primary concern.

Bus.Law. 117, 118–20 (1978). This acceleration began to slow significantly with the Supreme Court's decision in *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). Some commentators view *Blue Chip Stamps* as the beginning of the Supreme Court's shift toward a more restrictive, even hostile attitude toward implied rights of action under the federal securities laws. Pitt, *supra,* at 118 n. 2.

The Supreme Court used the vehicle of *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), to distinguish its earlier decision in *J. I. Case Co. v. Borak,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), which had first acknowledged the propriety of implying private damage actions under the federal securities laws. In *Cort,* a case arising under the Federal Election Campaign Act, the Supreme Court fur-

ther applied the brakes to litigation dependent upon judicially-constructed private rights of action by setting forth a four-prong test to guide the federal courts in determining whether, and when, to imply the existence of private damage actions where Congress had failed to provide for such actions expressly. Pitt, *supra* at 120. The acceleration that had begun with *Kardon* in 1946 finally ground to a halt in *Piper v. Chris-Craft Industries, Inc.,* 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977), when the Supreme Court applied the *Cort* test to the federal securities laws.

The general trend of the Supreme Court to limit the scope of the federal securities laws in areas other than those implying private rights of action continues as well. *See International Brotherhood of Teamsters v. Daniel,* —— U.S. ——, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979).

*Sacks, supra,* 193 U.S.App.D.C. at 90, 593 F.2d at 1244; *see, e. g.,* S.Rep.No.792, 73d Cong., 2d Sess. 4 (1934); 78 Cong.Rec. 7921–22 (remarks of Representative Maples). The *Sacks* Court continues:

Congress anticipated three modes of securities control to achieve this goal: statutory provisions, Commission regulations, and exchange rules. Under this scheme, exchanges are imbued with quasi-governmental power and transformed from private trade associations into organizations sharing responsibility for maintenance of an orderly and fair securities market. In establishing this tripartite system, Congress specifically contemplated active self-regulation of the industry and the aggressive promulgation of exchange rules. *See Silver v. New York Stock Exchange,* 373 U.S. 341, 351–52, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963); S.Rep.No. 1455, 75th Cong., 3d Sess. 3–5 (1938); H.Rep.No.2307, 75th Cong., 3d Sess. 4–6 (1938); H.Rep.No.1383, 73d Cong., 2d Sess. 5 (1934).

*Id.*

In *Silver v. New York Stock Exchange,* 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963), Mr. Justice Goldberg reviewed the history and scope of stock exchange power in the period immediately preceding the Stock Market Crash of 1929 and the inability of the stock exchanges to deal with the problems of the Great Depression due to lack of self-regulation. 373 U.S. at 349–51, 83 S.Ct. 1246. The *Silver* Court noted that it was the "combination of the enormous growth in the power and impact of exchanges in our economy, and their inability and unwillingness to curb abuses which had increasingly grave implications because of this growth, that moved the Congress to enact the Securities Exchange Act of 1934." *Id.* at 351–52, 83 S.Ct. at 1254. The Senate Committee Report stressed that "the initiative and responsibility for promulgating regulations pertaining to the administration of their ordinary affairs remain with the exchanges themselves. It is only where they fail adequately to provide protection to investors that the Commission is authorized to step in and compel them to do so." S.Rep.No.792, 73d Cong., 2d Sess. 15 (1934).

The federally mandated duty of self-regulation by the exchanges thus arose with the enactment of the 1934 Act. In section 5 of the Act, 15 U.S.C. § 78e, a duty was placed upon the exchanges to register with the Commission. The Act decreed that registration could not be granted unless the exchange submitted copies of its rules, § 6(a)(3), 15 U.S.C. § 78f(a)(3), and unless such rules were "just and adequate to insure fair dealing and to protect investors," § 6(d), 15 U.S.C. § 78f(d). An aspect of the statutorily imposed duty of self-regulation is the obligation of each exchange to formulate rules governing the conduct of its members. § 6(b), 15 U.S.C. § 78f(b). The general requirement of section 6(d) that an exchange's rules be "just and adequate to insure fair dealing and to protect investors" has obvious relevance to the area of rules regulating conduct of exchange members. *Silver, supra,* 373 U.S. at 353, 83 S.Ct. 1246.

The New York Stock Exchange is an organization whose members are pledged to abide by the Constitution of the Exchange, and all of the rules and regulations adopted thereto. In *Baird v. Franklin,* 141 F.2d 238 (2d Cir.), *cert. denied,* 323 U.S. 737, 65 S.Ct. 38, 89 L.Ed. 591 (1944), Judge Clark examined the formation of the Exchange and its registration with the Commission after the enactment of the 1934 Act, stating:

One of the objects of the association as expressed in the Constitution then in force was to promote and inculcate just and equitable principles of trade and business, and any violation of this aim was punishable by expulsion from the Exchange. . . . These provisions followed the terms of § 6(b) of the Securities Exchange Act, 15 U.S.C.A. § 78f, and were inserted into the Rules as a prerequisite to registration as a national securities exchange with the Securities and Exchange Commission. The Exchange applied for registration around September 1, 1934, having shortly before that executed the agreement, required by § 6(a)(1) of the Act, "to comply, and to enforce so far as within its powers com-

pliance by its members, with the provisions" of the Act. On September 28, 1934, pursuant to the power vested in it by § 6(d) of the Act, the Commission adjudged the Rules of the Exchange to be "just and adequate to insure fair dealing and to protect investors," and granted the application.

141 F.2d at 241–42 (Clark, J., dissenting in part).

The Rules of the New York Stock Exchange must be read to mirror the objectives of their drafters—"to promote and inculcate just and equitable principles of trade and business." *Id.* Accordingly, the rules are in the nature of a code of ethical conduct imposed upon members of the Exchange, rather than legal principles which, if allegedly violated, give rise to a cause of action.[6] The *Sacks* Court explains:

> Exchange rules are basically of two types. Some rules are merely "housekeeping devices," concerned with internal exchange organization and uniformity of procedure. Although these rules indirectly benefit the customer, they are concerned with matters primarily of interest to exchange members. In contrast, other rules are promulgated directly for the protection of the investing public and regulate the kind of fraudulent conduct to which the Act is specifically directed. These rules insure the integrity of the securities market, not simply the efficient functioning of exchanges. They often serve as *substitutes* for Commission regulations and are vital to effective securities control.

*Sacks, supra,* 193 U.S.App.D.C. at 90, 593 F.2d at 1244 (citations omitted) (emphasis in original).

Rule 405, at issue here, is clearly not a substitution for a Commission regulation; the "Know Your Customer" rule is subsumed within section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and within Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated thereunder. This is not to

conclude, however, that violation of Rule 405 might not be evidential, if relevant, to prove fraud alleged in a claim made under Rule 10b–5. *See Kaufman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 464 F.Supp. 528 (D.Md.1978). Rule 405 simply does not meet the second and third parts of the *Cort* guidelines; that is, there is no indication that Congress intended to create a remedy for violation of these rules, and implication of such a remedy would be inconsistent with the legislative scheme. As Judge Friendly succinctly stated:

> Congress scarcely contemplated judicial creation of a new body of federal broker-customer law whenever the complaint in what would otherwise be an action under state law alleged conduct inconsistent with just and equitable principles of trade.

*Colonial Realty, supra,* 358 F.2d at 183.

The final segment of the *Cort* test asks whether the cause of action is one traditionally relegated to state law. Rule 405 imposes a duty upon the broker to exercise due diligence in the conduct of a customer's account. Violation of such a duty sounds in negligence or breach of contract, either of which is wholly cognizable in the state courts. Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, confers jurisdiction in the federal courts for violations of "this chapter or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this chapter or the rules and regulations thereunder." The *Colonial Realty* Court recognized the dire implications of allowing a private right of action for the alleged violation of an exchange rule, stating:

> [I]f § 27 [of the Securities Exchange Act of 1934] were read to include exchange rules, the jurisdiction of the federal courts would be exclusive whenever the plaintiff alleged that violation of an exchange rule created a liability or duty created by the Securities Exchange Act

---

6. *See* 2 Loss, Securities Regulation 1175 (2d Ed. 1961), where Professor Loss notes that "in a highly complex field like the securities business there is a large area for the operation of exchange rules on the level of business ethics rather than law."

and the state courts would be altogether stripped of power to adjudicate claims so pleaded even between their own citizens. 358 F.2d at 183 (citation and footnote omitted).

■ If violation of Rule 405 gives rise to any cause of action at all, such a suit would be on common law principles and be most appropriate for resolution in the state courts. *See Piper, supra,* 430 U.S. at 40–41, 97 S.Ct. 926; *Cort, supra,* 422 U.S. at 84, 95 S.Ct. 2080. The Court of Appeals for the District of Columbia Circuit recognized that expansive implication of federal liability for violations of exchange rules would displace adequate common law actions and undermine a state court's power to apply traditional remedies. *Sacks, supra,* 193 U.S.App. D.C. at 90, 593 F.2d at 1244. Where existing remedies are sufficient, this court need not reach to imply additional means to achieve congressional policy. *See Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 477–78, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977). Accordingly, under the facts before this court and the evolving law in this area, I find there is no implied federal right of action for an alleged violation of Rule 405, and the Second Count should, therefore, be dismissed for failure to state a claim upon which relief can be granted.

### III

### THE THIRD COUNT AND NYSE RULE 431

■ New York Stock Exchange Rule 431 requires that an investor's equity in a margin account be maintained at not less than 25% of the market value of the securities in the account. The Third Count of the complaint alleges that the defendant, while subject to the rules and regulations of the Board of Governors of the Federal Reserve System, violated these rules and regulations "by failing to collect the required funds to properly finance the account on a timely basis." Complaint, Third Count at ¶ 3. The

complaint further alleges that "[s]uch actions and omissions by defendant did also violate N.Y.S.E. Rule 431." Complaint, Third Count at ¶ 4. Plaintiff seeks damages from defendant for such violations.

The issue thus is whether an alleged violation of Rule 431 gives rise to an implied federal right of action. The analysis is much the same as required to determine whether Rule 405 provided such an implied right. It is clear that Rule 431 was not created for the especial benefit of the investor. On the contrary, "[m]argin maintenance requirements are established primarily to protect the solvency of brokers by assuring adequate collateral for their loans that finance customer speculation." *Carras v. Burns,* 516 F.2d 251, 260 (4th Cir. 1975). In considering whether violation of Rule 431 creates a cause of action cognizable in a federal court, the Court of Appeals for the Fifth Circuit in *McCormick v. Esposito,* 500 F.2d 620, 627 (5th Cir. 1974), held that there would be no right of action for an investor who knew his account was undermargined and took no corrective action. That Court declined to find a private right of action for alleged violation of Rule 431 in the absence of any evidence of a broker's intentional violation of NYSE Rules misleading of its customer, particularly when the customer should have known that the account was undermargined. *Id.* at 628.

Here, plaintiff testified at depositions during discovery in the earlier suit before this court, Civ. No. 77–105, which discovery is made expressly applicable to this action by virtue of the stipulation entered into by the parties at the conclusion of the first case. *See* Appendix A (Stipulation). The deposition testimony clearly indicates that plaintiff received considerable correspondence from defendant concerning the status of his account, including margin call slips, yet, curiously, plaintiff rarely opened this mail, and when he did, he never took more than a cursory glance at it.[7] Plaintiff was

---

7. *See* Plaintiff's Deposition in Civil Action 77–105 for November 1, 1977, at pages 24 (7–16), 43 (17–19), 44 (18) through 45 (1), 46 (5–20) regarding margin call notices, and 47 (2–20).

*See also* plaintiff's deposition of December 1, 1977, at pages 18 (22) through 19 (1), 22 (15–18) regarding notices of margin calls, 24 (16–18), 31 (17) through 32 (13), and 35 (12–19).

placed in a position where he should have known the status of his accounts and whether he was becoming undermargined. The allegations of the complaint fail to plead any intentional misconduct by defendants causing violation of Rule 431. Plaintiff's deposition testimony reveals a pattern of what can arguably be described as lack of diligence in overseeing his investments. The conclusory allegation of a violation of Rule 431 warranting an award of damages is insufficient to sustain an action based upon violation of this Rule. *See Hsue Tung v. Broussard*, [1974] Fed.Sec.L.Rep. (CCH), ¶ 94,471 (D.C.D.C.1974); *Shemtob v. Shearson, Hammill & Co.*, 448 F.2d 442 (2d Cir. 1971). *See also Gordon v. duPont Glore Forgan Inc.*, 487 F.2d 1260 (5th Cir. 1973), *cert. denied*, 417 U.S. 946, 94 S.Ct. 3071, 41 L.Ed.2d 666 (1974). *Contra, Evans v. Kerbs & Co.*, 411 F.Supp. 616 (S.D.N.Y.1976) (Cannella, J.); *Heller v. Thomson & McKinnon Auchincloss Kohlmeyer, Inc.*, [1977] Fed. Sec.L.Rep. (CCH), ¶ 95,811 (S.D.N.Y.1976) (Cannella, J.).

There is nothing in the legislative history of the Securities Exchange Act which implies that Congress intended to grant a right of action in the federal courts for violation of an exchange's rules concerning margin maintenance requirements. *See Zagari v. Dean Witter & Co.*, [1976] Fed.Sec.L. Rep. (CCH) ¶ 95,777 (N.D.Cal.1976). Nor would it be consistent with the legislative scheme or purpose of the Act to imply such a remedy for the plaintiff here. Moreover, plaintiff has adequate remedies to redress any damage he may have suffered from the alleged violation of Rule 431 without resort to the federal forum. Margin maintenance rules are usually set forth in a formal margin agreement between the investor and broker and, where not formally recited, may be considered to be implied terms of the agreement. Therefore, plaintiff would have a breach of contract action readily cognizable in the state courts, *id.* at 90,813–3; *Carras v. Burns, supra*, at 260, and may have a suit for breach of fiduciary duty as well. *See Gordon v. duPont Glore Forgan Inc., supra.* Accordingly, plaintiff's allegation of a violation of Rule 431 in the Third

Count does not give rise to a private right of action in the federal court and, as to that allegation, the Third Count should be dismissed for failure to state a claim upon which relief can be granted.

## IV

### THE THIRD COUNT AND REGULATION T

In the Third Count, plaintiff makes a general allegation that defendant violated Regulation T of the Federal Reserve System, "codified as 12 C.F.R. § 220 and all of its subparts, and other regulations designed to implement such [margin maintenance] requirements." Complaint, Third Count, ¶ 3.

Section 7 of the Securities Exchange Act of 1934, 15 U.S.C. § 78g, relates to margin requirements. Subsection (a) declares its purpose to prevent "the excessive use of credit for the purchase or carrying of securities." Subsection (c) provides that it is unlawful for a broker "directly or indirectly, to extend or maintain credit . . . for any customer—(1) on any security . ., in contravention of the rules and regulations which the Board of Governors of the Federal Reserve System shall prescribe . . . ." Regulation T was so prescribed. 12 C.F.R. § 220 (1978). In essence, it requires a broker to liquidate a customer's order if payment is not received within seven days from the date of purchase. If the customer in good faith agrees to make full cash payment upon delivery of the security, payment may be delayed until delivery which must take place within 35 days of the purchase. 12 C.F.R. § 220.4(c)(5) (1978); *see Utah State University, supra*, 549 F.2d at 169. In response to plaintiff's allegations, defendants contend that section 7 and Regulation T do not give rise to an implied right of action in the federal court.

In *Pearlstein v. Scudder & German*, 429 F.2d 1136 (2d Cir. 1970), *cert. denied*, 401 U.S. 1013, 91 S.Ct. 1250, 28 L.Ed.2d 550 (1971) (*Pearlstein I*), the Court of Appeals for the Second Circuit recognized an implied right of action under section 7 and

Regulation T for a brokerage customer. But, in so finding, that Court noted that the legislative history showed "protection of individual investors was a purpose only incidental to the protection of the overall economy from excessive speculations." *Id.* at 1140. In a vigorous dissent from the finding of an implied right of action, Judge Friendly recalled the report of the House Committee, H.R.Rep.No.1383, 73d Cong., 2 Sess. 8 (1934), which stated: "The main purpose of these margin provisions * * is to give a Government credit agency an effective method of reducing the aggregate amount of the nation's credit resources which can be directed by speculation into the stock market and out of other more desirable uses of commerce and industry . . . ." 429 F.2d at 1147 (Friendly, J., dissenting). Judge Friendly noted that concern for the investor was wholly subordinated to the achievement of macro-economic objectives. *Id.* (citation omitted); *see* Note, Implied Private Actions for Federal Margin Violations: *The Cort v. Ash Factors*, 47 Fordham L. Rev. 242 (1978) [hereinafter cited as *Margin Violations*]; Note, Federal Margin Requirements as a basis for Civil Liability, 66 Colum.L.Rev. 1462, 1467–71 (1966).

Application of the guidelines suggested by the Supreme Court in *Cort v. Ash, supra,* to section 7 and Regulation T provides an appropriate analysis for determining whether an alleged violation of either gives rise to an implied right of action. *See, e. g., Establissement Tomis v. Shearson Hayden Stone, Inc.,* 459 F.Supp. 1355 (S.D.N.Y. 1978); *Stern v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* [Current] Fed.Sec.L.Rep. (CCH) ¶ 96,528 (D.Md.1978), *appeal docketed,* No. 78–1377 (4th Cir. June 16, 1978); *Nussbacher v. Chase Manhattan Bank,* 444 F.Supp. 973 (S.D.N.Y.1978); *Gutter v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* [1977–1978 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,239 (S.D.Ohio 1977); *Gluck v. Frankel,* 440 F.Supp. 1143 (S.D.N.Y.1977); *Palmer v. Thomson & McKinnon Auchincloss, Inc.,* 427 F.Supp. 915 (D.Conn.1977); *Schy v. FDIC,* [1977–1978 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,242 (E.D.N.Y.

1977); *Theoharous v. Bache & Co.,* [1977–1978 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,281 (D.Conn.1977).

In determining whether section 7 or Regulation T was enacted for the especial benefit of the investor, it is necessary to recognize the impact of the recent amendment of section 7. In 1970, Congress amended section 7 to make it unlawful for customers to obtain credit in violation of the applicable margin rules, 15 U.S.C. § 78f. Thus, the burden of margin violations was to be shared by customer and broker alike. *Nussbacher, supra,* 444 F.Supp. at 979, *Stern, supra,* [Current] Fed.Sec.L.Rep. (CCH) ¶ 96,528, at 94,089. The enactment of section 7(f) and implementation by Regulation X, 12 C.F.R. § 224 *et seq.,* subsequent to the opinion of the Second Circuit in *Pearlstein I,* forced a reevaluation by the courts of that decision since, at the time of *Pearlstein I* no customer accountability existed. *Tomis, supra,* 459 F.Supp. at 1358. When the Court of Appeals for the Second Circuit had the opportunity to analyze the new amendment to section 7 and the newly promulgated Regulation X, the court specifically noted that the amendment and new Regulation "cast doubt on the continued viability of our prior holding [in *Pearlstein I*]." *Pearlstein v. Scudder & German,* 527 F.2d 1141, 1145 n. 3 (2d Cir. 1975) (*Pearlstein II*). Thus, the creation of borrower liability for section 7 infractions under the new section 7(f) and Regulation X undermined the rationale for granting the investor a right to seek damages. *Margin Violations, supra,* at 247. The Court of Appeals for the Tenth Circuit in *Utah State University, supra,* held that enactment of section 7(f) and Regulation X effectively overruled *Pearlstein I.* 549 F.2d at 170. *Contra, Panayatopulas v. Chemical Bank,* No. 78 Civ. 565, slip op. at 7 (S.D.N.Y. Jan. 12, 1979).

The majority in *Pearlstein I* viewed the protection of individual investors as only an incidental purpose of the statute. 429 F.2d at 1140. The statute's primary purpose was to protect the national economy from an overextension of credit in the securities market. The regulations promulgated by

the Federal Reserve Board for controlling the lending activities of brokers, dealers, and banks in connection with the purchase of securities are also consistent with the desire to safeguard the nation's fiscal well-being. They do not, however, seem intended for the primary benefit of any particular class of persons. *See Pearlstein I*, 429 F.2d at 1148 (Friendly, J., dissenting); *Schy, supra*, [1977–1978 Transfer Binder] Fed.Sec.L. Rep. (CCH) ¶ 96,242, at 92,631; *Theoharous, supra*, [1977–1978 Transfer Binder] Fed.Sec. L.Rep. (CCH) ¶ 96,281, at 92,802. Indeed, as one commentator has noted, "by assuring investors that losses sustained through margin speculation may be recouped in an action for damages, a private right of action would seem to detract from the purpose of the statute to control such activity." *Margin Violations, supra* at 251. A credit-seeking investor must now comply with the margin requirements or face criminal penalties—a position virtually identical to that of the creditor who enables him to purchase or maintain the securities. *Id.* Accordingly, the status of investors as mere "incidental" beneficiaries under section 7 should preclude an implied right of action under the first guideline suggested by the *Cort* Court. *See, e. g., Tomis, supra*, 459 F.Supp. at 1359; *Stern, supra*, [Current] Fed.Sec.L. Rep. (CCH) ¶ 96,528 at 94,089; *Schy, supra*, [1977–1978 Transfer Binder] Fed.Sec.L.Rep. (CCH ¶ 96,242 at 96,242.

The second prong of the *Cort* guidelines requires analysis of the legislative intent. The legislative history of section 7 is silent as to the issue of private causes of action. In *Schy, supra*, Chief Judge Mishler inferred an intent to deny an implied right of action from Congressional silence on the subject. [1977–1978 Transfer Binder] Fed. Sec.L.Rep. (CCH) ¶ 96,242 at 92,630. The *Theoharous* Court interpreted the silence of Congress as allowing state law to control the investor-broker relationship. [1977– 1978 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,281 at 92,802. Since section 7(f) places a duty of margin compliance upon the borrower, it is arguable that Congress intended that he be given no private remedy. Granting a cause of action under sec-

tion 7 to the same investors that it regulates would seem not to advance the primary statutory purpose of protecting the national economy and, to that extent, would be inconsistent with the legislative objectives. *Margin Violations, supra* at 254–55; *see, Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 38, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977).

The third *Cort* factor to be assessed is whether an implied right of action would be consistent with the statutory purpose. As has already been noted, the primary purpose of section 7 is to provide a government agency with the power to limit the aggregate amount of credit which may be directed into the stock market and away from more economically productive uses. It is clear to me that implication of a private cause of action would not promote these market-oriented objectives. *See Pearlstein v. Scudder & German*, 429 F.2d at 1147 (Friendly, J., dissenting); *Margin Violations, supra*, at 256–57. An isolated violation of section 7 or Regulation T does not threaten to cause a significant alteration in the national credit policy. The *Stern* Court perceptively noted that

it may not be necessary to uncover all violations. The danger the Act seeks to prevent is a widespread disregard of the margin requirement sufficient to affect the general economy. The SEC can easily detect and control such widespread violations. It can hardly be said that private enforcement provides a necessary supplement to agency action. . . . In the end, the sole beneficiaries of a private cause of action under § 7 would be investors who have speculated and lost in the market place while the rest of the investing public would be forced to pay correspondingly higher brokerage fees.

[Current] Fed.Sec.L.Rep. (CCH) ¶ 96,528 at 94,089–94,090 (citations omitted). Any deterrent effect of a private remedy for a section 7 violation is insufficient to satisfy the third *Cort* guideline.

The final *Cort* factor to be considered is whether the area has been traditionally relegated to state law. Most courts have

found that regulation of margin trading has not traditionally been governed by local law. *See* Margin Violations, *supra*, at 258 n. 140. There are, however, remedies available in the state courts for fraud, breach of contract or breach of fiduciary duty. Proof of violation of margin requirements probably would be evidential in an action brought in the state courts under any of these theories.

This court concludes that implication of a private right of action for alleged violation of section 7 and Regulation T is inappropriate. The rationale of *Pearlstein I* has been effectively eviscerated by the enactment of section 7(f) and the promulgation of Regulation X. The finding of such a private right of action would in no way promote the macroeconomic objectives of section 7 and anomalously would aid those whom it also regulates. Accordingly, the remainder of the Third Count concerning alleged violations of Regulation T must be dismissed for failure to state a claim upon which relief can be granted.

## V

### THE FOURTH COUNT AND THE CBOE RULES

In the Fourth Count of the complaint, plaintiff alleges that defendants were subject to the Rules of the Chicago Board of Options Exchange and, with regard to plaintiff's account, did violate several of those Rules, specifically Rules 9.2, 9.3, 9.7, 9.8, 9.9 and 9.15. Plaintiff claims that defendants are liable for all damages caused by such violations.

The CBOE is one of the newest of the national securities exchanges. In 1973, the CBOE made application to the Securities Exchange Commission (SEC) for registration as a national securities exchange pursuant to section 6 of the Securities Exchange Act of 1934. Under section 6(d) of the Exchange Act, the SEC was required to register the exchange if it appeared that the exchange was so organized "as to be able to comply with the provisions of the Act and the rules and regulations thereunder and that the rules of the exchange [were] just and adequate to insure fair dealing and to protect investors." *In the Matter of the Chicago Board of Options Exchange, Inc.*, [1972–1973 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 79,212 (1973). After reviewing the application of the CBOE, the SEC determined to grant the registration. *Id.* ¶ 79,212, at 82,669. In the opinion issued along with the Order granting registration, the Commission stated:

> In reviewing CBOE's registration application, we have weighed its particular rule provisions against the regulatory objectives of the Exchange Act. Among other things, those objectives embody the concept that exchanges will deal fairly with the public; that exchanges will be organized in such a fashion as to ensure their continued viability in asserting self-regulatory oversight over their members; and that exchanges may, so far as is consonant with other regulatory objectives of the Act, maintain competitive viability with other exchanges.

*Id.* at 82,671. The Order granting registration states in pertinent part:

> It appearing to the Commission that the rules of said exchange [CBOE] provide for the expulsion, suspension or disciplining of a member for conduct or proceeding inconsistent with just and equitable principles of trade and declare that the willful violation of any provisions of the Act, or any rule or regulation thereunder, shall be considered conduct or proceeding inconsistent with just and equitable principles of trade; and
>
> It further appearing that said exchange is so organized as to be able to comply with the provisions of said Act and the rules and regulations thereunder, and that the rules of said exchange are just and adequate to insure fair dealing and to protect investors;
>
> IT IS ORDERED that the application of The Chicago Board of Options Exchange, Inc. for registration as a national

securities exchange be, and hereby is, granted.

*Id.* at 82,672.

The CBOE has established a Business Conduct Committee to determine whether a member has violated exchange Rules. CBOE Educational Circular No. 11 (Oct. 22, 1975). Disciplinary action is regularly taken by the SEC against exchange members who engage in transactions not conducive to the basic tenet of exchange regulation—maintenance of a fair and orderly market. *See, e. g., In re Howard J. Schultz,* Securities Exchange Act Rel. No. 15100 (Aug. 28, 1978); *In re Robert Lechman,* Securities Exchange Act Rel. No. 15101 (Aug. 28, 1978).

■ CBOE Rule 9.2 concerns the registration of options principals, certain persons to be approved by and registered with the Exchange. The Rule establishes the requirement for such persons to agree to abide by the Constitution and Rules of the Exchange as well as dealing with such persons' termination. Rule 9.3 concerns the registration of persons designated as representatives and the requirement that they also agree to abide by the Constitution and Rules of the Exchange. It is clear to me that these Rules are concerned wholly with regulating the ethical conduct of exchange members and any alleged violation of them provides, at most, a potential disciplinary action against a member. These Rules are not for the especial benefit of the investor but are internal housekeeping procedures of the Exchange. No private right of action by an investor accrues for their alleged violation.

■ Rule 9.7 requires an exchange member to exercise due diligence in the opening of a customer's account. Rule 9.8 concerns supervision by an options principal of customer accounts. Rule 9.9 deals with the suitability of an options recommendation by a member to a customer. In particular, the Rule addresses the maintenance of an existing account and the writing of a call option contract on a margin. Rule 9.15 concerns the providing of a current prospectus to each customer by the member at the time such customer's account is approved for options transactions. These Rules, taken as a group, are analogous to "The Suitability Rule" of the National Association of Securities Dealers discussed by the Second Circuit in *Colonial Realty, supra,* to NYSE Rule 405, the "Know Your Customer Rule," and NYSE Rule 431 dealing with margin requirements. For the reasons set forth in Parts II and III of this opinion, I conclude that there is no private right of action for alleged violation of these CBOE Rules. *See Kaufman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 464 F.Supp. at 539 (D.Md. 1978). Accordingly, the Fourth Count of the complaint concerning violations of the CBOE Rules must be dismissed for failure to state a claim upon which relief can be granted.

## VI

### THE EIGHTH COUNT AND THE NEW JERSEY UNIFORM SECURITIES LAW

The complaint filed in the original action before Judge Lacey contained no allegation of violations of the New Jersey Uniform Securities Law, N.J.Stat.Ann. § 49:3–47 *et seq.* (West 1970). The new complaint, presently before the court, alleges in the Eighth Count that the defendants violated various provisions of that statute. In the Stipulation entered into by the parties at the conclusion of the first action, *see* Appendix A (Stipulation), it was agreed that "[d]efendants will not assert any statute of limitations defenses to the causes of action alleged against defendants in this litigation." Therefore, a statute of limitations defense by the defendants is applicable to the allegations in the Eighth Count.

The New Jersey Uniform Securities Law confers a civil cause of action upon a buyer of securities sold by a broker who violates the statute or uses deceptive practices or untrue statements. N.J.Stat.Ann. § 49:3–71. Subsection (e) of title 49:3–71 states: "No person may sue under this section more than 2 years after the contract of sale." Thus, if this statute of limitations is the period to be applied to plaintiff's allegations

in the Eighth Count, any claim based upon transactions which took place more than two years prior to the filed date of this complaint would be barred. This complaint, for the first time alleging violations of the State securities law, was filed on March 9, 1978. The last date cited in the complaint alleging that a transaction occurred is April 14, 1976. If this two year limitations period is applicable, only violations based upon transactions between March 9, 1976 and April 14, 1976 would be actionable.

■ Plaintiff argues that the "new" Counts contained in the complaint filed in this action should be deemed to "relate back" to the filing date of the first action, January 17, 1977. Plaintiff urges that under Rule 15(c) of the Federal Rules of Civil Procedure the assertion of this new legal theory of recovery based upon the New Jersey Uniform Securities Law, but factually involving the same transactions and events alleged in the complaint in the first action, should not be barred by the statute of limitations.

Rule 15(c) states in pertinent part:

(c) Relation Back of Amendments

Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading.

This Rule is based on the concept that a party who is notified of litigation concerning a given transaction or occurrence has been given all the notice that statutes of limitation are intended to afford. 3 Moore's Federal Practice § 15.15 (1978). Plaintiff cites several cases in support of his relation back argument. None of those cases reflects the situation here; each concerns the amending of a complaint in a single action as opposed to the filing of a new action after taking a voluntary dismissal of a prior action. It seems clear to me that after plaintiff's motion to amend the complaint in the first case was denied, the entry of the Stipulation between the parties was a *quid pro quo* for the defend-

ants' agreement to a voluntary dismissal. To find that the allegations in the complaint filed in the new action relate back to the filing date of the earlier, dismissed action, would be to negate the agreement of the parties made manifest in the Stipulation. Accordingly, this court finds that the allegations in the Eighth Count do not relate back and that plaintiff is bound by the March 9, 1978 filing date for this action.

■ Plaintiff also argues that the "discovery" rule should be applied to the situation here in order to toll the running of the statute of limitations until he was made aware of the alleged violation of the securities law through the report of his expert, Bree. The discovery rule has been applied in New Jersey only to the two-year limitation period of N.J.Stat.Ann. § 2A:14–2 (West 1952), which pertains to personal injury actions. *Lawrence v. Bauer Publishing & Printing Ltd.*, 78 N.J. 371, 374 (1979) (Pashman, J., concurring). *See also Burd v. New Jersey Telephone Co.*, 76 N.J. 284, 386 A.2d 1310 (1978); *Rescigno v. Picinich*, 151 N.J.Super. 587, 594 n. 1, 377 A.2d 733 (Law Div.1977). There have been no cases extending the discovery rule to actions brought under the New Jersey Uniform Securities Law. Even if the concept of the discovery rule were to apply to the State securities law, plaintiff would be unable to avail himself of its benefit. The rule states that the cause of action accrues "at the time when the claimant knows or in the exercise of reasonable diligence should have known of a breach of duty owed him by the defendant and he knows or in the exercise of reasonable diligence should have known that he has suffered injury as a result of that breach." *Gleason v. United States*, 458 F.2d 171, 174 (3d Cir. 1972) (applying New Jersey law). Here, the deposition testimony of plaintiff indicates a lack of reasonable diligence in overseeing his investments. *See note 7, supra.* Accordingly, the discovery rule will not toll the running of the two-year statute of limitations set forth in N.J.Stat.Ann. § 19:3–71(e). Plaintiff will be barred from pursuing any claim based upon transactions which occurred prior to March 9, 1976 in the Eighth Count.

CONCLUSION

As a result of the foregoing, defendants' motion to dismiss the Second, Third and Fourth Counts for failure to state a claim will be granted. Partial summary judgment as to the Eighth Count will be granted in accordance with Part VI of this opinion. The voluntary dismissal agreed to by the parties after the denial of the motion to amend the complaint in the first action has succeeded in nothing more than delaying disposition of this controversy. Plaintiff is in no better position. Now that the maneuvering is complete, this case will move expeditiously toward trial.

### APPENDIX A

*STIPULATION*

(As amended by the parties)

WHEREAS, the parties are presently involved in a litigation captioned above, and

WHEREAS, the Court has recently denied plaintiff's Motion to Amend his Complaint, and

WHEREAS, plaintiff is about to institute new litigation against defendants in this action, a copy of which Complaint is annexed hereto as Exhibit "A", and

WHEREAS, the parties are desirous of avoiding multiplicity of litigation, and

WHEREAS, it is the desire of the parties that neither side be prejudiced in any way by the dismissal of this action.

IT IS, hereby stipulated and agreed:

(1) This action will be dismissed without prejudice;

(2) Defendants will not assert any statute of limitations to the causes of action set forth in the new litigation which duplicate the causes of action alleged against defendants in this litigation; and

(3) All discovery engaged in in this litigation shall be applicable to the new litigation; however, new discovery may be engaged in in the new litigation. Rulings of this Court in the above captioned litigation relative to discovery matters shall be binding on the parties in the new litigation.